# EXHIBIT G

New Hampshire Supreme Court

**Attorney Discipline Office**

James L. DeHart
General Counsel

Thomas V. Trevethick
Deputy General Counsel

Janet F. DeVito
Assistant General Counsel

4 Park Street, Suite 304
Concord, New Hampshire 03301
603-224-5828 • Fax 603-228-9511

Landya B. McCafferty
Disciplinary Counsel

James L. Kruse
Assistant Disciplinary Counsel

Craig A. Calaman, CPA
Staff Auditor

June 9, 2006

Hand-Delivered

Holly B. Fazzino, Administrative Coordinator
New Hampshire Supreme Court
Professional Conduct Committee
4 Park Street, Suite 304
Concord, New Hampshire 03301

Re:   Griffith, John P. advs Arthur Ginsberg - #02-131

Dear Ms. Fazzino:

Enclosed please find the original and 12 copies of a "Request for Dismissal with a Warning" in this matter. Pursuant to Supreme Court Rule 37A(III)(b)(8), I am submitting this pleading to the Professional Conduct Committee. Would you kindly forward this pleading to the members of the PCC in advance of their next scheduled meeting?

Mr. Ginsberg and Mr. Griffith disagree with undersigned counsel's analysis and conclusion. Both have been advised that they may file a response.

Please feel free to contact me if you need any further information.

Sincerely,

Landya B. McCafferty
Disciplinary Counsel

LBM/bg
Enclosure
cc:   John P. Griffith, Esquire
      Arthur Ginsberg

# NEW HAMPSHIRE SUPREME COURT

# PROFESSIONAL CONDUCT COMMITTEE

Griffith, John P.

advs.

Arthur Ginsberg

#02-131

# REQUEST FOR DISMISSAL WITH A WARNING

NOW COMES Landya B. McCafferty, Disciplinary Counsel, and
respectfully requests that the Professional Conduct Committee dismiss this
matter with a finding of no professional misconduct and accompany the
dismissal with a warning

In support, undersigned counsel states as follows:

1    This Request for Dismissal with a Warning is filed pursuant to New
     Hampshire Supreme Court Rule 37A(III)(b)(8)

2    On October 12, 2004, the New Hampshire Supreme Court
     approved the hiring of Diane M. Nicolosi, Esq , to act as Assistant
     Disciplinary Counsel   Ms Nicolosi performed the investigation in
     this case and, on April 19, 2006, presented undersigned counsel
     with her findings and conclusions   The instant pleading is based

on Ms Nicolosi's work product

3     Ms Nicolosi reviewed the underlying pleading file (containing
      approximately 500 documents) and the Attorney Discipline Office's
      file (now containing over 2500 pages), and spoke to the following
      individuals: Arthur Ginsberg, the complainant; John P Griffith,
      the respondent; Barbara Woodward, Mr. Griffith's wife and
      paralegal; Anna Barbara (Bobbi) Hantz and Luci Pillsbury (now
      Gardner) counsel for Mr Ginsberg; Michael C Harvell and Michael
      J Lambert, counsel for Mr. Ginsberg; Kathleen M Earnshaw, the
      guardian *ad litem*; and Paul Haskell, a bailiff during one of the
      relevant court proceedings

4     Having carefully reviewed Ms Nicolosi's work product, undersigned
      counsel concurs in her conclusion that "there is no valid basis for
      proceeding to a hearing . . " See Supreme Ct R 37A(III)(b)(8).

5     What follows is a summary of Ms Nicolosi's analysis and
      conclusions, and a request for relief

## I.  FACTUAL BACKGROUND

6     Mr Ginsberg and Jennifer Wilson were married in 1980  They
      have two children, Elizabeth (DOB: 9/9/1986) and Alyssa (DOB
      8/22/1989)

7     In 1994, Mr Ginsberg and David Kahan incorporated Empire
      Multimedia Corporation ("Empire") to develop multimedia software
      In 1995, Mr Ginsberg, Mr Kahan and Steven Trussman

2

incorporated D.A.S. Visual Media Corporation ("D.A.S.") to develop, market and sell software for computer based videoconferencing and to do contract computer programming for videoconferencing. Mr. Kahan and Mr. Ginsberg eventually bought out Mr. Trussman, leaving them the sole shareholders in both corporations. At the time of the divorce, the business had essentially one customer, Integrated Physicians' Network, Inc. ("IPNi"), from whom most of the revenue was generated

8.  In the summer of 1998, Mr. Ginsberg and Ms. Wilson separated. In September of 1998, Ms. Wilson filed for divorce based on irreconcilable differences  The children were 12 and 9 at the time. John F Durkin, Esquire, appeared for Ms. Wilson.

9.  In September 1998, Ms. Pillsbury appeared for Mr. Ginsberg. In October 1998, Mr. Ginsberg answered the petition and filed a cross petition alleging adultery and conduct causing serious harm to health and/or reason.

10. Judge Hampsey was specially assigned to the case. A contested temporary hearing was held on March 12, 1999.

11. Ms. Earnshaw filed her first guardian *ad litem* report on June 15, 1999, recommending joint legal and shared physical custody, with Mr. Ginsberg's residence being primary. On November 8, 1999, she filed an update, and recommended that Mr. Ginsberg have primary physical custody. In doing so, she recognized that the

3

case had become "very acrimonious" and the "communication between the parties [had] completely broken down " However, even in her initial report, Ms Earnshaw noted that the tension between the parties was escalating, that there were significant differences in parenting styles, that allegations of child abuse had been made against Ms Wilson, and that the parties had already had a disagreement about visitation, which purportedly led Mr. Ginsberg to instruct a caretaker to call the police if Ms Wilson tried to take the children

12    Trial was scheduled the week of August 2, 1999

13    Thereafter, Mr. Durkin withdrew and, on June 21 and 28, 1999, respectively, Mr Griffith and Mr Spaloss appeared on behalf of Ms Wilson  On June 28, 1999, Mr Spaloss filed a motion to continue the trial.  On July 2, 1999, Judge Hampsey denied the motion and rejected Mr. Spaloss' appearance, finding his appearance unnecessary.

14    On July 12, 1999, Mr Griffith filed a <u>Motion for Continuance and Extension of Time for Discovery</u>  On July 14, 1999, he filed an amended and verified version of the same and a <u>Motion for Recusal and Reconsideration</u>, which was heard on July 22, 1999  On July 22, the recusal and reconsideration motion was granted, and the Court's earlier order denying Mr. Spaloss' appearance was vacated

4

15. Judge Hollman was specially assigned through trial. On March 23, 2001, Judge Groff was specially assigned following Ms. Wilson's motion to recuse, in which she alleged Judge Hollman's improper bias The motion to recuse was not ruled on due to Judge Groff's assignment

16 Trial took place on November 8, 9, and 10 and December 13, 14, 15, and 20, 1999

17 On March 9, 2000, the Final Orders and Decree was issued, as were findings of facts and rulings of law Both parties appealed

18. On July 19, 2000, Ms Pillsbury withdrew Mr Ginsberg was *pro se* until February 2, 2001, when Ms Hantz appeared on his behalf

19 On January 19, 2001, the Supreme Court remanded the case to the Superior Court for a further hearing on the issue of the business valuation, based on Mr Ginsberg's assertion that there was newly discovered evidence On July 17, 2001, the Superior Court resolved the issue in Ms Wilson's favor On February 25, 2002, the parties' appeals were declined, and on March 11, 2002, the Supreme Court denied the final motion for reconsideration, making Judge Hollman's order effective

20 During the interim between the final order and resolution of the appeal, the litigation went on unabated. The court docket reflects the entry of 208 documents over the two-year period Nor did the resolution of the appeal quell the acrimony The docket reflects the

5

entry of over 100 more documents through December 2003  The

pleading file includes post-trial motions alleging parental

alienation, numerous cross allegations of contempt relating to

financial and parenting issues, motions to recuse the judge and

appoint a new GAL, disputes about the operation of the final

decree, and a mittimus for nonpayment of alimony

21.   By 2003, Mr. Ginsberg's financial circumstances went downhill

drastically, leading to his requests for relief from his alimony and

monthly property award payments and for assistance with his

daughter's private school costs  In June of 2003, he filed for

bankruptcy  On December 22, 2003, shortly after which the

parties settled, Mr  Ginsberg filed a <u>Motion to Reduce/Terminate</u>

<u>Alimony</u>.  Mr  Ginsberg remains unemployed and bitter about the

effect this divorce proceeding had on his children and his life

22    It is difficult to convey in summary form the contentiousness that

pervaded this case  The parties disputed a multitude of issues,

including custody, the disposition of the marital estate, the

valuation of Mr  Ginsberg's business interests, alimony, child

support, Ms. Wilson's ability to parent, and her obligation to work.

Although the acrimony without question increased over the years,

from the start the pleadings are accusatory and discordant  It is a

painful example of what one would hope the legal system would

not produce.

6

23. Throughout the case, the issues were litigated aggressively. Mr Ginsberg accused Ms Wilson of abusing alcohol in a manner detrimental to the children's physical and emotional well being He accused her of physical and emotional abuse of the children and of attempting to involve the children in a "cult." He accused her of lying, breaking into his home, planting drugs and documents in his home, manufacturing evidence, and stealing or concealing documents In September of 1999, she was arrested for simple assault for allegedly scratching Mr Ginsberg during a dispute about whether she could enter the marital home. He branded her an adulterer and, in essence, described her as a narcissistic mother whose priorities were money over her children, a claim he continues to advance

24 When Mr Griffith entered the case, Mr. Ginsberg had already filed two motions for contempt alleging that Ms Wilson was untruthful in her pleadings, offered to trade custody of the children for money, and violated the temporary orders by drinking alcohol in front of the children

25. Mr. Ginsberg, on the other hand, hotly contested Ms. Wilson's characterization of him as a fraud, a liar, and paranoid, as potentially suffering from a mental disorder, a drug user, a physically and emotionally abusive father, and a controlling and emotionally abusive husband Although Mr Ginsberg says that he

7

and his counsel tried throughout to settle the case fairly and
amicably, and Mr Griffith claims the same on behalf of his client,
the tone of the pleadings and correspondence flowing both ways
belies these claims. The parties appeared to dispute everything,
from small to large issues, and usually with personal attacks and
extreme characterizations of fact Although there is no agreement
on where the blame should lie, the only apparent point of
agreement by all involved is that the case was a nightmare that
bankrupted this family financially and emotionally.

26    Mr. Ginsberg raises many issues in his complaint and contends
that Mr. Griffith and his client conspired and engaged in a pattern
of conduct that, when taken as a whole, shows a concerted effort
over the years to deceive the court and improperly influence the
proceedings His claims implicate N.H R Prof Conduct 3.3, 3.4,
4 1, 4.4, and 8.4.

27    In order to evaluate Mr Ginsberg's separate claims and his
conspiracy and pattern claim, Ms Nicolosi reviewed almost the
entire pleading file and all of the documents provided by Mr
Ginsberg and Mr Griffith, and conducted numerous interviews
Although both parties cooperated with all requests in a timely
manner, it should be noted that Ms Nicolosi's review was limited
by the assertion of the attorney-client and work product privileges
and by both parties' disinclination to allow her complete access to

8

the unprivileged portions of the files because of their concern that the files were incomplete and disorganized. Both were agreeable to meeting with and producing anything Ms Nicolosi specifically requested.

28    After due consideration, undersigned counsel concurs with Ms Nicolosi's opinion that Mr Ginsberg's claims cannot be proven by clear and convincing evidence and should be dismissed with a warning The claims that merit individual discussion are analyzed in turn below Those that are not discussed were not considered viable professional misconduct claims warranting separate analysis

## II. ANALYSIS AND CONCLUSIONS

### A. Complaints Warranting No Disciplinary Action

29    The following complaints fail to state claims of misconduct or are not supported by clear and convincing evidence of misconduct.

**Appearance of Attorney Spaloss and Recusal of Judge Hampsey**

30    Mr Ginsberg complained in February of 2002 that Mr. Griffith and Mr. Spaloss engaged in "judge shopping" by having Mr. Spaloss file an appearance for the sole purpose of forcing the recusal of Judge Hampsey, Mr. Spaloss' good friend.

31    On January 5, 2003, Mr. Ginsberg made clear that his complaint was lodged against both Messrs Spaloss and Griffith On January

9

22, 2003, Mr. Griffith denied the claim. On January 22, 2003, Mr.
Spaloss also denied the claim. On December 19, 2003, after
investigation by Robert C Dewhirst, Esq , the Professional
Conduct Committee dismissed the matter against Mr Spaloss with
a finding of no professional misconduct.

32    On January 14, 2004, Mr. Ginsberg wrote a five-page letter taking
issue with the Professional Conduct Committee's decision not to
proceed against Mr. Spaloss   On January 23, 2004, Mr. Ginsberg
sought to amend his complaint against Mr. Spaloss, as co-counsel
with Mr Griffith, to join him in the additional issues he raised
against Mr. Griffith   On May 6, 2004, Mr. Ginsberg filed a Motion
for Hearing, again challenging the Committee's dismissal decision.

33    On May 27, 2004, Mr Spaloss provided an accounting of his hours
at the Committee's request. On June 17, 2004, Mr. Ginsberg
wrote another letter assailing Mr. Spaloss' accounting

34.   On June 18, 2004, the Professional Conduct Committee reviewed
the supplemental filings and declined to reconsider its finding of no
professional misconduct. On July 14, 2004, Mr Ginsberg
complained again about the Professional Conduct Committee's
denial of his request for reconsideration   The Committee
considered this letter, along with his letters of January 23 and
June 17, 2004, as further motions for reconsideration. The
Committee refused to reconsider. Mr Ginsberg unsuccessfully

10

sought relief from the New Hampshire Supreme Court.

35.    Ms. Nicolosi was provided with the Supreme Court filing and

related documents and reviewed them in their entirety   Mr.

Ginsberg has added nothing new in support of his complaint

against Mr  Griffith that was not considered by the Professional

Conduct Committee in dismissing the complaint against Mr

Spaloss   The complaints are substantively the same.  There is no

basis to revisit the issue

### Fraud Accusations For Wrongfully Diverting Products

36    In Ms  Wilson's _Amended and Verified Motion For Continuance_

_And Extension of Time For Discovery_, at paragraph 4, Mr. Griffith

wrote:

> The Respondent further:  either misrepresented
> to the court the value of his interest in the companies
> by claiming that they have "little value as a personal
> service business"; or, the many products that had
> belonged to the companies, described elsewhere as
> producing significant income, have been wrongfully
> diverted in order to deprive Petitioner of an equitable
> division of assets as provided by law

In paragraph 20, Mr  Griffith justified the need for discovery to

"explore issues of fraud and diversion of assets "

37    Mr  Ginsberg complains that Mr  Griffith's accusations of fraud or

dishonesty are false and that Mr  Griffith and Ms  Wilson conspired

to present the false information.  Mr  Griffith, on the other hand,

contends that his pleading is based on evidence, not the least of

11

which is his client's attestation to the facts contained in the
motion

38    Contrary to Mr. Ginsberg's claim, sufficient factual support existed
      for Mr Griffith's statement and argument about the products   On
      March 28, 2006, Mr. Griffith produced a document entitled,
      "Empire/D.A S. Visual Media Corporation Business Plan" dated
      June 3, 1998, (hereinafter referred to simply as the "D A S
      Business Plan") upon which Mr. Griffith relied for the conclusion
      that profitable products must exist.[1]  Mr  Griffith points to pages
      8-10 of the report for a description of the products and page 36 for
      the substantial income projected from these products through
      2002. Mr  Griffith also produced on April 7, 2006, brochures for
      the products.

39    Mr. Ginsberg questions the quality of this evidence because he
      says the report was a draft and produced by people who were fired
      by his company   He also accuses Ms  Wilson of stealing the plan
      and misrepresenting the date and the finality of the report when
      she printed it off the business computer in June of 1998 after the
      parties separated   Mr. Ginsberg's contention appears suspect and,
      in any event, the finality of the report would not have been
      apparent to Mr  Griffith from looking at the report

---

[1] Because the D A S  Business Plan plays a large role in this matter, it is attached to this
motion as Exhibit 1

40.   On April 18, 2006, Mr Griffith produced two reports that he
      obtained from another lawyer's file   The first was the June 1998
      plan   It appears to be an original and final version   The back and
      front of the plan are covered with clear plastic sheets that were
      once bound together with the report, as is evidenced by the holes
      along the left side of the covers and pages   To contrast, Mr
      Griffith produced a second version of the D A S  Business Plan,
      this one clearly marked PRELIMINARY and dated March 1998
      Finally, Mr. Ginsberg produced a copy of a letter, dated March 9,
      1998, authored by Mr Ginsberg to the consultant who produced
      the reports, firing the consultant before the project completion
      The letter makes clear that Mr. Ginsberg provided substantial
      information about D.A.S to the consultant in the process

41.   In any case, Mr Ginsberg's points about the plan, even assuming
      they are true, are proper ones to explore on cross-examination of
      Ms Wilson or her witnesses, but do not undermine the factual
      foundation of Mr. Griffith's motion to render it frivolous or
      dishonest

**Misrepresentation By Omission as to Value of Stock Options**

42    Mr. Ginsberg also complains that in the same <u>Amended and
      Verified Motion For Continuance and Extension of Time For
      Discovery</u>, Mr. Griffith misrepresented that Mr. Ginsberg failed to
      disclose stock options on his financial affidavit at the March 1999

13

temporary hearing   In paragraph 4, Mr  Griffith wrote:

> At the temporary hearing in this matter, held in March
> of 1999, Respondent fraudulently understated his
> assets to the court, in that he disclosed no Integrated
> Physicians' Network, Inc. stock options; yet in other
> documents, the same stock options are described as
> having been distributed to the stockholders of the
> companies with Respondent's share valued at
> $271,250

43.   The stock options are not listed on the March 1999 financial

affidavit.

44   In an Objection to Mr  Ginsberg's <u>Motion to Strike and Motion for</u>

<u>Sanctions and Attorney's Fees</u>, relative to the motion, Mr. Griffith

wrote in paragraph 5:

> At the appropriate time Petitioner will present proof,
> that the Respondent has at other times, to other
> persons and for other purposes, valued these stock
> options at much higher figures[ ]

45.   Mr. Griffith points to page 37 of the D.A S. Business Plan, which

references these stock options as having a value of $542,500 in

1997   The Ginsbergs had a one-half interest in these options   In

fact, Mr. Griffith's statements about the D A.S  Business Plan are

accurate

46   Mr  Ginsberg complains that Mr  Griffith failed to point out that he

had previously disclosed the existence of the stock options in his

answers to interrogatories and that Mr. Griffith had more credible

information from Ms  Pillsbury as to the minimal value of the

options   This certainly serves as an explanation for the omission

14

on the financial affidavit, and again, these are deficiencies that Ms
Pillsbury was free to point out in her pleadings and during the
motion hearing

### Education Funds

47    During the course of the parties' marriage, Ms Wilson's
grandfather made substantial gifts to each family member
According to Mr Ginsberg, prior to the parties' separation, Ms
Wilson told him the children's money was in accounts in their
names    In March of 1999, Mr Ginsberg learned that this was not
true    Mr Ginsberg claims the money to the children was
earmarked for their education and further claims that Ms Wilson
misappropriated the funds    He accuses Mr Griffith of conspiring
with her to hide the money trail and prevent a financial accounting
by presenting inconsistent statements about the funds and by
impeding discovery

48    The alleged discrepancy in information about the children's money
pertains primarily to Ms. Wilson's statements about certain
investments held in the parties' names, the Oakmark and
Kaufman funds

49    At the start of the case, when prior counsel, Mr Durkin,
represented Ms. Wilson, Mr Ginsberg was provided with an asset
list, labeled Exhibit A.   On that list, the Kaufman and Oakmark
funds are labeled as joint accounts and are listed under a general

15

category, "Accounts for Children " On Ms Wilson's financial
affidavit in July 1999, after Mr. Griffith appeared, she apparently
lists the same accounts as "joint accounts" with no reference to the
children  This is consistent with a document that Ms. Wilson sent
to Mr  Ginsberg and Ms  Pillsbury with a fax date of December 22,
1998, which predates Mr  Griffith's involvement.  On this
document, Ms Wilson lists the Kaufman and Oakmark funds,
along with two other investment accounts, under the general
heading, "Investments," and designates them as joint accounts
without reference to the children  It is also consistent with another
asset list she apparently created in 1997, prior to the divorce,
which generally lists the Oakmark funds as joint assets of the
parties

50    Pending appeal, on August 17, 2001, Ms  Wilson filed a motion to
allow the sale of the parties' Oakmark funds, which she was
awarded in the final decree  Mr  Ginsberg objected on August 24
and 27.  In his first objection, he represents that Ms  Wilson
testified that the Oakmark funds were earmarked for the children's
education  This is consistent with her proposed decree setting off
these funds for the children

51    The inconsistencies in statements with regard to the Oakmark
funds and Kaufman funds are not significant  The funds were
accurately labeled as joint assets.  Ms. Wilson's omission when

16

commenting that the funds were earmarked for the children's education, something she said at the start and end the case, does not indicate a substantive variance, much less a falsehood that she conspired with Mr. Griffith to advance

52    At the December 12, 2001, hearing on her motion to allow the sale of the Oakmark funds, Ms. Wilson testified that the Oakmark funds were purchased with money gifted to the children by her grandfather   She explained that the money gifted to the children *went to a variety of places: to purchase the Oakmark funds and* some to the Kaufman funds; a portion was spent on the children's camp   She further testified that Mr  Ginsberg insisted that some of the money go into their "bank account in order to continue to operate the family while he worked on growing the business, and so they went into our general living expenses and into investing in the business "

53.   Although it is conceivable that Ms  Wilson lied to Mr. Ginsberg before the divorce as to the existence of the accounts and throughout the divorce to present day as to the whereabouts and use of the gifted money, her written statements and her testimony in essence are consistent -- that is, that the gifted money was either spent or invested

54    The parties vigorously disputed whether Mr. Ginsberg was entitled to discovery relative to the funds as a post-trial matter   Although

17

his efforts to complete a "financial accounting" for the period prior to his separation were thwarted by Mr Griffith's lack of cooperation in this regard, there is no evidence of any conspiratorial behavior on the part of Mr. Griffith to hide these funds   No rule of professional conduct was violated by Mr. Griffith's position on behalf of his client that discovery should not be had on the educational funds at this late stage of the proceedings.

### Testimony During Shareholder Suit and Tape of Proceeding

55      In its Final Decree of March 9, 2000, the Court valued Mr Ginsberg's interest in D A S. and Empire at $400,000, and awarded Ms. Wilson half the value

56.     In September 2001, Mr Ginsberg transferred three shares of D.A.S stock to Mr Kahan   By transferring the shares, Mr. Ginsberg gave Mr Kahan majority ownership of both closely held corporations   The two companies were then merged, leaving Mr. Kahan holding 51% and Mr Ginsberg holding 49% of the shares of the post-merger D.A S   Shortly after the merger, Mr Kahan reconstituted the board of directors and terminated Mr Ginsberg from the company

57      Following his termination, Mr Ginsberg brought a shareholders suit against the Kahans and D A S. in the Hillsborough County Superior Court, Southern District, <u>Arthur Ginsberg, et al v. David</u>

18

<u>Kahan & Haemi Kahan, et al</u>, Docket No. *01-E-0468*.  Mr  Ginsberg
was represented by Mr  Harvell and Mr. Lambert of Sheehan,
Phinney, Bass & Green, P.A   Mr. Griffith, on Ms. Wilson's behalf,
filed a motion to intervene, which was eventually granted

58      On October 26, 2001, Ms  Wilson filed a pleading in the divorce
case entitled, <u>Motion for Contempt for Violation of Restraining
Order, Ex-Parte Motion to add 3rd Party, Motion for Rescission,
Motion for Temporary Restraining Orders, Preliminary &
Permanent Injunction</u>.  Therein, she complained that Mr. Ginsberg
violated the divorce court's restraining order by transferring the
stock to David Kahan

59.     On October 23 and 24, 2001, the Court held a hearing in the
shareholder suit on Mr. Ginsberg's plea for a temporary injunction
to enjoin his removal from the business operations   Mr  Griffith
and his client were present at and participated in the preliminary
injunction hearing   During the first day of the hearing Mr.
Ginsberg testified as to his understanding of his "agreement" with
Mr. Kahan when the stock was transferred and the companies
merged   The Court found Mr. Ginsberg's version of the partners'
dealings believable and, on November 9, 2001, issued a temporary
restraining order against the Kahans and D.A.S

60.     On December 12, 2001, a hearing was held in the divorce case on
Ms  Wilson's motion for contempt and to rescind the stock

19

transfer. Mr. Griffith elicited information from Ms Wilson during direct examination about her recollections of Mr. Ginsberg's testimony during the October 2001 preliminary injunction hearing relative to Mr. Kahan and Mr. Ginsberg's merger "agreement." The following exchange took place:

| Mr. Griffith: | Now, Ms. Wilson, at the stockholders (unintelligible) action -- |
|---|---|
| Ms. Wilson: | Yeah. |
| Mr. Griffith: | -- were you present at the hearing they had on the preliminary injunction? |
| Ms Wilson: | Yes, I was. |
| Mr. Griffith: | And did you hear Mr. Ginsberg testify? |
| Ms. Wilson: | Yes, I did. |
| Mr. Griffith: | And did he testify about gifting the stock to Mr. Kahan? |
| Ms. Wilson: | Umm – |
| Mr. Griffith: | Let's strike that. Strike that. Did you hear him testify about an agreement he had made with Mr. Kahan on the eve of your divorce trial, about the stock? |
| Ms. Wilson: | -- Yes. |
| Mr. Griffith: | And what was that? |
| Ms. Wilson: | The agreement was, was that he was going to agree to a cut in pay, and to be a minority shareholder in both companies. |

20

| Mr Griffith: | And what was the quid-pro-quo? What was he getting for it? |
|---|---|
| Ms Wilson: | In return for David testifying against me |
| Mr Griffith: | And also testifying against the value of the company? |
| Ms Wilson: | And also testifying as to the lack of value of the companies. |

61    Following this colloquy, Ms Hantz objected to the admissibility of Ms. Wilson's testimony on the basis that it was hearsay, it was "not supported by the record in that hearing," and she did not "have a transcript of that " In response, Mr. Griffith stated: "-- We have a – it's tape-recorded, and we'll give the Court the date and the time that (simultaneous, inaudible) " Ms. Hantz, apparently understanding Mr. Griffith to mean he had a copy of the hearing tape, requested in writing that Mr. Griffith produce it.

62    Mr. Ginsberg claims that Ms Wilson's testimony on December 12 about "the agreement to testify" was materially false.  He further contends that Mr. Griffith suborned perjury, because he was present for Mr. Ginsberg's October 2001 testimony  He also claims that Mr. Griffith misrepresented that he had a copy of the tape to bolster the false testimony

63    Ms. Nicolosi listened to the court tapes of the cross-examinations and redirect of Mr. Ginsberg  During Mr. Griffith's cross-examination, Mr. Ginsberg testified that he could not specifically

21

recall when he agreed to give up his 50-50 split of ownership in

D A S  He admitted that his agreement to take "the short end of

the stick," as Mr. Griffith characterized it, might have occurred in

November 1999. Thereafter, the following exchange took place:

| | |
|---|---|
| Mr  Griffith: | What did Mr  Kahan give you for you to agree to take the short end of the stick in D.A.S ? |
| Mr  Ginsberg: | Ahh, I – I, you know, can't remember   I think it might have had to do something with the divorce. |
| Mr  Griffith: | Did he agree to go in and testify for you and help you out in your divorce? |
| Mr  Ginsberg: | Umm, I don't know if he agreed to come in and help me testify . testify to help me out   He did agree to testify |

64      Having reviewed the December 2001 transcript, the relevant

pleadings, and the October 2001 hearing tape, Ms. Nicolosi

concluded that the evidence could not support a finding by clear

and convincing evidence that Mr  Griffith suborned perjury or

misrepresented to the court the existence of the tape.  To the

contrary, the transcript of the October hearing in sum reflects that

Mr  Kahan did agree to testify at Mr. Ginsberg's divorce hearing

and that the agreement was made in connection with a future

merger of the two companies   Although Mr. Ginsberg did not

specify at the preliminary injunction hearing what Mr  Kahan's

22

testimony would be, it is a reasonable inference that Mr Kahan would offer testimony favorable to Mr. Ginsberg's position in the divorce case.

65 Furthermore, there was no misrepresentation as to Mr. Griffith's possession of the hearing tape during the December 2001 hearing. It is clear from a comprehensive reading of the passage that Mr Griffith misspoke when he began his sentence with the words, "we have " He immediately corrected himself by saying, "it's tape-recorded," and by offering to provide information on how the tape could be found in the record of the court.

66 Mr. Ginsberg challenges the reliability of the December transcript and insists that the tape should be double-checked. Ms. Nicolosi found no cause to undertake further examination of the tape and declined to expend the resources to so.

### Delaying Acceptance of Funds for Arrest for Nonpayment of Alimony

67 On December 24, 2001, the Court granted Ms. Wilson's motion for contempt against Mr. Ginsberg for nonpayment of alimony The Court ruled as follows:

> The respondent is in arrears in the amount of $10,500. The respondent shall pay to the petitioner the amount of $10,500 within 10 days of the date of this order. If the respondent fails to do so, a mittimus shall issue committing him to the House of Corrections until purged of contempt. Motions to reconsider and appeals do not stay the Court's order for commitment for contempt.

23

68    On January 3, 2002, Mr. Ginsberg filed an *ex parte* motion for
      relief from the mittimus and stay of final orders. His oldest
      daughter accompanied him to court to explain to the judge her
      view of the situation.

69    On Friday, January 4, 2002, Ms. Wilson filed a verified notice of
      violation of the court order. On the same day, Mr. Ginsberg's *ex*
      *parte* motion was denied and a mittimus was issued for Mr.
      Ginsberg's arrest if he failed to pay the $10,500 by January 4,
      2002.

70    According to Mr. Ginsberg, he managed to raise the money to pay
      the $10,500 by Sunday morning. He contacted his lawyer's office,
      Gottesman & Hollis, P.A., to make arrangements to deliver the
      funds

71.   Mr. Ginsberg complains to the Professional Conduct Committee
      that Mr. Griffith conspired with Ms. Wilson to delay acceptance of
      the alimony funds from Sunday morning until almost noon on
      Monday. He contends that the motive for this delay was to allow
      time for his arrest so Ms Wilson would gain tactical advantage in
      her efforts to modify custody.

72    According to a letter dated January 9, 2002, and the case notes of
      David M. Gottesman, Esq., the following events took place.

73    On Sunday, January 6, 2002, at 11:50 a.m., Mr Gottesman first
      contacted Mr. Griffith to inform him that his client had checks

                                    24

totaling $10,500. Over the course of several phone calls, during which they discussed the manner of payment, Mr. Griffith agreed to accept two personal checks written to Mr. Ginsberg and endorsed over to Mr. Griffith as counsel for Ms. Wilson. Mr. Gottesman obtained directions to Mr. Griffith's home with the intention of driving the checks to him that evening. However, at 5:45 p.m. in a final phone call on Sunday, Mr. Griffith told Mr. Gottesman that it would be inconvenient for him to accept the checks that evening because he had plans with his family. Mr. Gottesman's case note indicates that Mr. Griffith said he was going to the Wilton Theater with his family. Mr. Griffith asked Mr Gottesman to meet him instead at the courthouse at 8:30 a.m. on Monday, which Mr. Gottesman agreed to do.

74. Mr. Ginsberg accuses Mr. Griffith of lying to Mr. Gottesman about his theater plans for Sunday evening, and alleges that Mr. Griffith was planning instead to meet with Ms. Wilson and Mr. Hamilton on Sunday night. Mr. Griffith responds that he recalls wanting to go to the movies with his family, but cannot recall whether he got there due to "Mr. Ginsberg's antics."

75 Mr. Griffith's motive to lie to Mr. Gottesman about his plans is not readily apparent. Mr. Griffith could simply have declined to have Mr. Gottesman at his home on Sunday night. Ms. Woodward explained during an interview on April 7, 2006, that the change of

25

plan had to do with her dissatisfaction about the case interfering with plans she had made with their children   In addition, there was never any effort on Mr Griffith's part to disguise or hide his intention to file motions to hold Ms Wilson in contempt for involving Elizabeth in the proceedings and to change custody   The motions were discussed on Sunday night and, despite Mr Gottesman's efforts to dissuade Mr. Griffith from doing so, the possibility remained that Ms Wilson might choose to go forward with them on Monday morning

76    On Monday morning, Mr Gottesman arrived at the courthouse at 8:20 a m  and waited for Mr Griffith until 8:40 a.m.  At 8:40 a m , Mr. Gottesman called Mr Griffith   Mr. Griffith indicated that he was in Peterborough and would be at Mr Gottesman's office at 10:00 a m   Mr Griffith also informed him that he now wanted cash or funds run through Mr Gottesman's account rather that checks from third parties.  However, Mr. Ginsberg had already endorsed the checks over to Mr Griffith.  The attorneys agreed to work it out at 10:00 a m.

77    When Mr Gottesman arrived at his office, he discovered voice mail messages on his office and cell phones from Mr Griffith indicating that he was running late and had changed his desired method of payment to cash

26

78    Mr Griffith failed to show at 10:00 a.m   Mr. Gottesman called him
      at 10:10 a m. Mr. Gottesman's note indicates that Mr. Griffith told
      him "he was swinging over to see Jennifer, and he would be right
      over here " Mr Gottesman indicated in his follow-up letter to Mr.
      Griffith that Mr  Griffith told him that he was meeting his client at
      her <u>home</u>

79    Mr. Ginsberg claims Mr  Griffith must have been lying about going
      to see Ms  Wilson at home because Ms  Wilson was not at her
      home.  Ms. Wilson testified in a deposition that she was at the
      courthouse at 9:00 a m. on that Monday morning and, indeed,
      there were two witnesses to that fact.  Mr Gottesman's
      interpretation of what Mr. Griffith told him makes little sense,
      given that Ms  Wilson lived in Vermont.  It is also inconsistent with
      his case note of his conversation with Mr. Griffith.  If Mr  Griffith
      were "swinging over" to see Ms. Wilson in Vermont, there is no
      possibility he could have been "right over" to Mr. Gottesman's
      office, which was just around the corner from the courthouse  It is
      more likely, therefore, that Mr  Griffith expected to see Ms. Wilson
      at the courthouse before meeting Mr  Gottesman.

80.   At 10:50 a.m., Mr. Gottesman left a voice mail message on Mr.
      Griffith's cell phone.

81.   At approximately 11:20 a.m , Mr  Griffith arrived at Mr
      Gottesman's office with Ms. Woodward.  Mr. Griffith took the

checks, but refused to sign a receipt   Apparently, there was some discussion about Mr  Ginsberg moving to Florida and concern about accepting a check instead of cash

82    Mr  Ginsberg speculates that Mr  Griffith then sought to raise a bogus issue about Mr  Ginsberg's potential move to Florida to further extend the time to allow for his arrest for nonpayment of alimony.  This issue, however, appears to have been of genuine concern to Ms  Wilson   The court subsequently issued an order on her motion limiting Mr  Ginsberg's relocation

83    Mr  Ginsberg says that while Mr  Griffith was talking with Mr  Gottesman, Ms  Woodward was seen searching the employee parking lot   Mr  Ginsberg assumes she was looking for his car to determine his whereabouts to facilitate the arrest.  This effort, even if true, was not necessarily improper.  Ms  Wilson was entitled to funds on January 4   Until payment was made, Ms  Wilson's financial interests were arguably served by tracking the whereabouts of Mr  Ginsberg and possibly by his arrest

84    After Mr  Griffith refused to sign a receipt for the checks, Mr. Gottesman filed a notice of payment with the court

85    Mr  Griffith committed no professional misconduct by refusing to sign a receipt until the funds were clearly available   Had Mr  Ginsberg's friends' checks bounced, Ms  Wilson's only recourse would have been to reinitiate the proceedings in court, losing

28

valuable time and any leverage or access to Mr. Ginsberg that she may have had.

86. Approximately one-half hour later, Mr. Griffith reappeared at Mr Gottesman's office and said he had been informed that it would take four to five days for the checks to clear. Mr. Gottesman then accompanied Mr. Griffith to the banks  Mr. Gottesman's case note indicates that "the large check was changed to a bank check with Citizens and the smaller one was cashed at Fleet after some initial hassle. Margaret Pratt cleared it for me." Mr Griffith was satisfied and promised to inform the court that the arrearage was paid.

87. Later that day, the sheriff called Mr. Gottesman to indicate that he had a mittimus. The mittimus was never executed and was withdrawn on the same date.

88 Mr. Griffith cannot account for his whereabouts on Sunday night and early Monday morning, although Ms Woodward believes a good portion of the morning was spent at the courthouse with Ms. Wilson. According to Ms. Woodward, it had been a very difficult weekend, including a significant change in Ms. Wilson's visitation plan with the girls, the emotional upheaval caused by the litigation, and Elizabeth's arrest for shoplifting.

89. Mr. Ginsberg argues that it is obvious that Mr. Griffith made a concerted attempt to have him arrested. The conclusion is not grounded in provable fact. As is most often the case, the parties'

29

views of each other's actions differ greatly   While Ms  Wilson
contends that Mr  Ginsberg "set the whole contempt matter up" to
make the children angry at her, Mr  Ginsberg sees the evil flowing
from her to him   The most that can be proven is that Mr  Griffith
was late in accepting the checks and hard-nosed in making sure
that the funds were available on Monday, January 7, 2002

90   Mr  Ginsberg's perception of these events is understandable given
his potentially imminent arrest   Mr  Griffith's change of heart on
Sunday night and the almost three hour delay on Monday morning
no doubt created intense stress and anxiety for him and his
daughters   Although arguably unkind and emotionally harmful to
the children, it cannot be said that the scenario gives rise to a
professional conduct violation   Mr  Griffith was entitled to protect
his client's interests by demanding cash   Although time was of the
essence for Mr  Ginsberg, it was likely equally important from Ms
Wilson's perspective that the *ex parte* motion for change of custody
be ready for filing immediately upon Mr  Ginsberg's arrest if the
funds turned out to be unavailable

91   Taking all of the events as a whole, the facts do not support a
finding by clear and convincing evidence that the delay in
accepting money from Mr. Ginsberg involved strategic avoidance
on the part of Mr. Griffith to effect Mr  Ginsberg's arrest.

30

92    It is worth noting that the issue of bad faith tactics was also raised

before the Court   On January 15 and 24, 2002, respectively, Ms.

Wilson and Mr. Ginsberg filed motions for contempt, each alleging

parental misconduct and actions intended to alienate the children

Mr  Ginsberg alleged that Elizabeth reported to him that Ms

Wilson was attempting to influence her against her father during

the weekend of January 5-6.  Mr  Ginsberg also claimed that Ms.

Wilson, Mr  Griffith, and John Hamilton were plotting against him

in Elizabeth's presence [2]

93    On July 22, 2002, the Court appointed Barbara Millar, Esquire, to

serve as guardian *ad litem* to investigate the child-related issues

raised in the parties' motions   On September 27, 2002, Ms  Millar

filed her report   She indicated that both parties came to the court

with unclean hands, and that the parties, perhaps subconsciously,

had influenced the children and involved them in the parties'

divorce proceedings especially during the weekend of Mr

Ginsberg's potential arrest   She found that Mr. Ginsberg left the

State of New Hampshire to avoid being arrested, and that Ms

---

[2] John Hamilton's testimony does not support the claim   Mr  Hamilton is a friend with whom
the girls and Ms  Wilson stayed during the weekend of January 5-6   He was deposed twice   He
testified that he prepared an affidavit and met with Mr  Griffith and Ms. Woodward at Kinko's
on Sunday night to sign an affidavit.  Mr  Hamilton testified that the affidavit prepared by the
Griffith firm was an accurate reflection of what he conveyed to them previously by email   At
first he said that he met Mr  Griffith and Barbara Woodward at 7 - 8 pm, but later, to be
careful, he said that it could have been between 5 and 9 pm   He testified that the affidavit was
an accurate reflection of what he believed at the time   He was not aware of motions being filed
in connection with the affidavit nor was he aware of any plan to file for a change of custody on
the following Monday

31

Wilson kept Elizabeth and Alyssa beyond the required Sunday 5:00 p m return time, until the alimony was paid. She also found that Ms Wilson stayed in New Hampshire in order to be nearby in case Mr Ginsberg could not raise the money, because she was prepared to file an *ex parte* motion for custody on Monday morning

94    On December 12, 2002, Mr Ginsberg filed a motion for further orders based on the GAL report  He requested that the court make note of "the pattern of false and malicious pleadings which have been previously filed in this case alleging similar interference with the children and/or visitation in an attempt to gain advantage, change of custody, or obtain favorable financial rulings, which have been largely unsuccessful which have caused attorneys fees " He accused Mr Griffith and his client of conspiring to have him falsely arrested by avoiding receipt of alimony checks that were available on Sunday, January 6, 2002.

95    On February 20, 2003, the Court denied Mr Ginsberg's motion for further orders based on the GAL report. The Court denied Mr Ginsberg's request for sanctions for petitioner's allegedly false and disingenuous pleadings, opining that "these issues have been previously litigated and nothing in the GAL's report provides any further justification for such sanctions "

96    On July 2, 2003, the Court found both parties to be in contempt: Mr. Ginsberg for involving Elizabeth in the court proceedings

32

relative to his *capias*, and Ms Wilson for involving Alyssa in her attempts to change custody  The Court found that "both parties have denigrated the other party in front of the children and attempted to alienate them from the other parent  The parties, despite the lapse of three years from the original divorce decree do not seem to tire of attempting to strengthen the alliance with one of the children at the expense of the other parent." No sanctions were imposed

### Nazarenko & Helaine Ginsberg Affidavit

97   On May 26, 2000, Ms. Wilson signed an affidavit in which she attested to certain statements made to her by Diane Nazarenko and Helaine Ginsberg. In the first paragraph of her affidavit, Ms. Wilson states: "In February of 2000, I heard alarming evidence of psychological disturbances being suffered by my children while in the custody of Respondent "

98   Mr Ginsberg accuses Mr. Griffith of conspiring with Ms. Wilson to introduce this false affidavit, because Ms Nazarenko and Ms. Ginsberg both denied that they told Ms Wilson that the children were suffering from psychological disturbances. Their denials are irrelevant. Ms Wilson does not allege in her affidavit that either woman actually used the phrase: "psychological disturbances " Rather, this was Ms Wilson's conclusion or characterization based on the information she purportedly learned from the two women

33

99   On September 20, 2000, Diane Nazarenko signed an affidavit
      attesting to the fact that she did not call Ms Wilson to tell her that
      the children were suffering from psychological disturbances.  She
      did not, however, refute the specific statements attributed to her
      In a later deposition, Ms Nazarenko denies she made certain
      statements to Ms. Wilson; however, the substance of some she
      admits were made to the GAL

100  On June 8, 2000, Helaine Ginsberg signed a four page typewritten
      statement in which she denies telling Ms Wilson that there were
      "psychological disturbances" being suffered by her nieces while in
      the custody of Mr Ginsberg and denies certain statements
      attributed to her.  It should be noted that the majority of the
      statements attributed to Helaine Ginsberg in the Wilson affidavit
      are double hearsay

101  In any event, for purposes of evaluating the professional conduct
      claims asserted against Mr Griffith, the issue is not whether Ms.
      Wilson lied in her affidavit, but rather, whether Mr Griffith knew
      (or should have known) of her falsehoods and thereby participated
      in a fraud on the court.  Mr Ginsberg's claims fall far short of
      showing Mr. Griffith's complicity in this regard   Nor does there
      appear to be any independent basis for finding clear and
      convincing evidence of professional misconduct

34

### Improper Influence of Philip Kinsler, Ph.D.
### & Laura Landerman Ph.D.

102  Mr Ginsberg complains that Mr Griffith improperly influenced two
professionals, Philip Kinsler, Ph D and Laura Landerman, Ph D ,
to offer opinions based on false information that Mr Griffith
provided to them

103.  Dr. Kinsler performed a psychological examination of Ms Wilson,
which included psychological testing, as well as interviews of Ms
Wilson, two of her friends, and her brother   Dr Kinsler ultimately
concluded that Ms. Wilson had no psychopathology or substance
use or abuse disorder that would affect her ability to parent   Dr
Kinsler opined that "[Ms Wilson's] marital situation shows clear
similarities to those typically described in the literature as
controlling and battering," although he ultimately concluded that
she did not suffer from Post Traumatic Stress Disorder as a result.

104  Mr Ginsberg complains that Dr Kinsler was "a gun for hire" who
did not follow proper standards and procedures in his evaluation
According to Mr Ginsberg, Dr Kinsler did not "qualify" the
witnesses   Mr Ginsberg challenges the veracity of the lay
witnesses upon which Dr Kinsler relied in his analysis

105  Mr Ginsberg attributes responsibility for the witnesses'
unreliability and dishonesty to Mr Griffith, although he offers no
evidence of Mr Griffith's complicity in this regard

35

106. Dr. Kinsler appears to have relied heavily on his extensive
psychological testing of and interviews with Ms Wilson
Furthermore, any claim that Dr Kinsler did not follow required
protocol in his forensic evaluation are more appropriately
addressed to an ethics committee governing psychiatrists. Any
suggestion that Mr. Griffith is responsible for alleged flaws in Dr
Kinsler's performance is pure speculation

107 Mr. Ginsberg would also hold Mr Griffith responsible for Dr
Landerman's performance

108 Dr. Landerman counseled Alyssa briefly. On October 25, 1999, Dr.
Landerman issued a letter of opinion in which she recommended a
follow-up family evaluation  Mr Ginsberg claims that this
represents a change of opinion as to Alyssa's need for follow-up
mental health care that followed a two hour meeting with Mr
Griffith in a restaurant

109 Mr Ginsberg attributes Dr Landerman's change of opinion to Mr
Griffith's alleged improper influence  While Dr Landerman
acknowledges in her October 25, 1999, report that Mr Griffith had
informed her about the psychological evaluation of Ms Wilson,
there is no cause for finding impropriety on the part of Mr Griffith
A more plausible explanation for Dr. Landerman's conclusion is
that the information Mr. Griffith provided, and particularly the
Kinsler report, was relevant to and had an impact on her view of

36

this family and the need for a more intensive examination   There
is nothing improper about supplying an expert with information
that fills out the perspective of one's client; in fact, it is a lawyer's
duty to do so.

110   Mr  Griffith denies he improperly influenced Dr  Landerman or her
report and there is simply no basis in fact for finding otherwise

### Ms. Woodward's Attendance at School Meeting

111   Mr  Ginsberg complains that Ms  Woodward showed up at a school
meeting for his oldest daughter with Ms  Wilson and disrupted the
start of the meeting   He claims Ms. Woodward and Stephen M.
Bennett, counsel for the City of  Nashua, lied about the events of
the meeting night   He filed a related professional conduct claim
against Mr  Bennett, which was resolved in Mr  Bennett's favor.
There was nothing improper in Ms. Woodward's attendance to
support and assist Ms. Wilson   Mr. Griffith was not present and
thus has no personal knowledge of what transpired   Mr  Ginsberg
fails to state any viable claim against Mr. Griffith

### Misrepresentation of Arrest of Wife

112   Ms  Wilson was arrested at the marital home in September 1999
after Mr  Ginsberg called the police and informed them that Ms.
Wilson was violating an order of the court prohibiting her from
entering the residence   She was ultimately charged with simple
assault for allegedly scratching Mr. Ginsberg on the left elbow.

37

She was not charged with trespass or contempt   She was

acquitted in May 2000 after trial in the Nashua District Court

because the court found insufficient evidence of guilt   Mr. Spaloss

served as defense counsel in the district court proceeding

113   Mr. Ginsberg takes issue with subsequent statements of Mr.

Griffith regarding this incident, to the effect that Mr. Ginsberg

"had" (i.e., wanted) Ms. Wilson arrested in September of 1999, and

that Mr. Ginsberg was dishonest in connection with her arrest

Mr. Ginsberg claims that his call to the police was only to have Ms.

Wilson removed from the marital property because, in his view, her

conduct was in contempt of the court order giving him exclusive

use and possession of the marital property.

114   According to Mr Ginsberg he told the police officer that he did not

want Ms. Wilson arrested and testified to that effect at her

misdemeanor trial

115   Mr. Spaloss' legal position on behalf of Ms. Wilson was that there

was no restraining order outstanding and, thus, no contempt.[3]

Further, Mr Spaloss was able to attest to the fact that, in

December of 1999, while he was attempting to negotiate a non-trial

disposition of the criminal matter with the police officer, he learned

that Mr Ginsberg was "adamant" that she be prosecuted

---

[3] This view was endorsed by Judge Groff on August 20, 2001, when he denied Mr Ginsberg's
motion for contempt for an entry into the marital home

116. Mr. Ginsberg's call to the police and Mr. Spaloss' dealings with the prosecution certainly support the point of view that Mr. Ginsberg "had" Ms. Wilson criminally prosecuted based on what Ms. Wilson believed was a misrepresentation to the police about the court's order. The police report reflects Mr. Ginsberg's statement to the police at the arrest scene as follows: "She had arrangements to pick up their two daughters 13 yrs old and 10 yrs old, but according to the Superior Court order she is not to enter the residence. Mr. Ginsberg stated there is a previous contempt of court because she entered on another occasion." Further in a November 9, 1999, letter from Mr. Spaloss to Nashua Police Captain Don Connelly, Mr. Spaloss informed the police that "[t]here is no restraining order, neither in District Court or Superior Court."

117. The bottom line is that it was Mr. Ginsberg's actions that resulted in Ms. Wilson's arrest He called the police. He complained Mr. Ginsberg parses the meaning of Mr. Griffith's words, "had her arrested," too finely. Additionally, Mr Griffith cannot be blamed for accusing Mr. Ginsberg of exaggerating the legal effect of the marital order; there was no restraining order in effect.

**Barrage of Groundless Attacks Against the GAL**

118. Mr. Ginsberg complains that Mr. Griffith "continually moved for
the GAL's recusal" and set in motion a "barrage of groundless
attacks against [her]." The file reflects only one motion to remove
the GAL, filed on October 27, 1999, based on an allegation that
Ms. Earnshaw disclosed to Mr. Ginsberg confidential information
she obtained while serving as a GAL for Ms. Woodward's children.
Although Ms. Earnshaw denies that she disclosed confidential
information, she informed Ms. Nicolosi she could not say that Mr.
Griffith lied in connection with the allegation; she recognized that
there may have been a misunderstanding of fact.

119. The file also reflects a number of times post-trial when Mr. Griffith
argued that Ms. Earnshaw should not continue to serve as GAL.
No improper argument was made. Early on, it became clear that
Ms. Wilson distrusted Ms. Earnshaw and felt she was biased
against her. In July of 2002, because of the breakdown in
relationship between Ms. Wilson and Ms. Earnshaw, Judge Groff
chose not to reappoint Ms. Earnshaw and appointed Ms. Millar
instead to assist in resolving the post-trial motions alleging
alienation and contempt of child related orders.

120. During Ms. Nicolosi's interview with Ms. Earnshaw, she could not
point to any representation of Mr. Griffith that she would
characterize as an intentional misrepresentation. She did not

40

share Mr Ginsberg's view about Ms Wilson's dishonesty, in part because she had no basis for the opinion, given her limited direct contact with Ms Wilson after 1999  Nor did Ms Earnshaw share the opinion that Mr Griffith should be subject to discipline based on his dealings with her as GAL  She did not feel she had a basis to report professional misconduct

121   Upon review of the pleadings, there is no basis for charging professional misconduct in connection with positions taken or arguments made by Mr Griffith on behalf of Ms Wilson with respect to the GAL

### Post-Trial/Pre-Decision Filing (Ipni Press Releases)

122   On January 28, 2000, Mr Griffith filed a motion for consideration of newly discovered evidence  Although the final divorce hearing was completed in December 1999, the Court had not yet issued its final order

123   The motion filed by Mr Griffith included a press release indicating that IPNi had received a 1 5 million-dollar infusion of capital  Central to the parties' dispute about the value of the business was whether the relationship with IPNi would continue.

124   Mr Ginsberg alleges that Mr Griffith filed the frivolous motion only to improperly influence the Court.  Mr Griffith's argument was that the financial health of D.A S 's major customer would necessarily impact the financial health of Mr. Ginsberg's business

41

Although the Court ultimately declined to reopen the evidence and decided in favor of Mr. Ginsberg, it cannot be said that the motion was frivolous.

### Misleading Court in Questioning About Mr. Ginsberg's Motives for Filing Bankruptcy/Thwarting Attempts to Settle

125   In the spring of 2003, due to a major downturn in his business, Mr Ginsberg sought relief from the U.S Bankruptcy Court. Mr. Ginsberg claims that Mr. Griffith misled the court in his questioning of Mr. Ginsberg about his motive for filing bankruptcy in June of 2003.

126   During a related motion hearing, Mr. Griffith asked Mr Ginsberg whether his motive for filing bankruptcy was Ms. Wilson's motion to find him in contempt for failing to pay alimony   Mr. Ginsberg responded by claiming that Mr. Griffith had ambushed him with the motion for contempt by failing to make a proposal, as promised, to resolve the payment issue.

127   The factual history leading to this colloquy is as follows:  In the late winter/early spring of 2003, Mr. Ginsberg was having difficulty paying Ms. Wilson her alimony and property award   On April 23, 2003, Ms. Hantz notified Mr. Griffith by letter that Mr. Ginsberg was facing bankruptcy and had hired Michael S. Askenaizer, a bankruptcy lawyer, to assist him.  She passed on Mr. Askenaizer's suggestion that all parties and counsel meet to discuss options

42

before he proceeded to a Chapter 13 filing

128  By letter dated May 5, 2003, Ms. Hantz memorialized a
conversation she had with Mr Griffith in which Mr Griffith agreed
to meet  She also expressed her desire to meet before Mr Griffith
left for his annual one-month vacation to Italy  The vacation
apparently was from May 13 to June 11, 2003 [4]

129  In Ms Hantz's subsequent letter dated May 8, 2003, she
acknowledged the vacation schedule and reiterated Mr Ginsberg's
desire to meet before Mr. Griffith left.  Ms Hantz also enclosed a
draft motion for modification/termination of alimony and other
financial responsibilities  The motion was ultimately filed on May
12, 2003

130  On May 15, 2003, Ms Wilson objected to the motion for
modification  The Court index indicates that Mr Ginsberg's
motion was withdrawn by letter dated May 13, 2003

131  Approximately two weeks later, on June 2, 2003, Ms Wilson filed a
motion for contempt for nonpayment of alimony.

132  On June 12, 2003, Mr. Ginsberg objected and, on the same date,
refiled a motion for modification of alimony and financial
responsibilities.  In Mr Ginsberg's objection to the motion for

---

[4] A motion to continue was filed on April 9, 2003, indicating that Mr Griffith would be gone
between these dates

contempt he states: "The Petitioner is unwilling to agree to any accommodation, and instead of responding with a proposal as counsel indicated he would, she filed this Motion for Contempt."

133   On June 19, 2003, Mr Ginsberg filed for bankruptcy

134.   Mr Ginsberg claims that he delayed filing for bankruptcy because of Mr Griffith's agreement to provide a proposal to resolve the financial issues and possibly avoid bankruptcy. He alleges that Mr. Griffith sabotaged him and that Mr Griffith's interrogation at the hearing implying that his motive for filing bankruptcy was Ms Wilson's contempt motion, was intended to mislead the court.

135   Mr Ginsberg's complaint falls short of a professional conduct violation   First, the propounding of a question is not an assertion of fact or a representation   Mr Ginsberg was free to answer the question in the negative and explain   Secondly, Ms. Hantz's May letters evidence Mr Ginsberg's intent to pursue bankruptcy if Ms Wilson did not come to the table to negotiate. She chose not to, which she made crystal clear by filing her motion for contempt Mr. Griffith's question was not unreasonable

### Woodward Affidavit

136.   Mr. Ginsberg claims that Mr. Griffith filed false information with the Professional Conduct Committee by providing a false affidavit of his wife-paralegal, Ms Woodward   The facts leading to the filing

44

of the affidavit follow.

137   During Mr. Griffith's cross-examination of Mr. Ginsberg during the last day of the final divorce hearing in December 1999, a court bailiff, Paul Haskell, approached a woman in the audience   Mr. Haskell did so because the woman was "shaking her head, distorting her face and making facial expressions as the witness testified." Mr. Haskell requested that the woman stop the distracting conduct, conduct Mr. Ginsberg believes was intended to intimidate and harass him

138.   According to Ms. Pillsbury and Ms. Earnshaw, when the Court recessed, there was a discussion about the incident. In interviews with Ms. Nicolosi, Mr. Ginsberg, Ms. Earnshaw and Ms. Pillsbury identified Ms. Woodward as the woman approached by Mr Haskell.

139   On July 10, 2001, one and a half years after the trial, Mr. Haskell signed an affidavit at the behest of Ms. Hantz   Mr. Haskell did not identify or describe in the affidavit the woman whom he approached and, according to Mr Ginsberg, was unable to do so

140.   On November 20, 2000, in a *pro se* Response to Petitioner's Objection to Respondent's Motion for Contempt and Emergency Motion for Psychological Evaluation, Mr. Ginsberg alleged that it was Ms Woodward who was approached by the bailiff. In his pleading, in paragraph 10, Mr. Ginsberg named Tricia Norris as a witness to Ms Woodward's behavior. He also referenced similar

45

conduct of Ms  Woodward during the 1999 deposition of a witness,
Ms  Nazarenko, which he argues bolsters his claim that it was Ms
Woodward who was approached in the courtroom

141    On February 19, 2002, Mr  Ginsberg reiterated his allegations
about Ms  Woodward's conduct in his complaint to the Professional
Conduct Committee  In response, Mr  Griffith denied that Ms
Woodward was approached by a bailiff at trial and submitted Ms
Woodward's affidavit in support  Therein, Ms. Woodward swore
she had "no recollection about being spoken to by a bailiff about
[her] conduct." Ms  Woodward detailed a January 2003 telephone
conversation she had with Mr  Haskell  She stated that Mr.
Haskell told her that the woman he approached  "was not a
participant in the proceedings, had no papers with her and that,
"[t]o his recollection, the woman had black hair, was in her late
forties and was heavy,  not obese, but heavy[ ]" This description is
not consistent with Ms  Woodward's appearance

142   According to Mr  Ginsberg, this description fits Tricia Norris, the
witness who was present in the courtroom.  Ms  Woodward,
however, in her interview with Ms  Nicolosi on April 7, 2006, said
she believed the woman approached was the cousin of their client,
whose name she does not recall

46

143   Ms Woodward attested further that Mr Haskell told her that Mr
      Ginsberg's attorney said that "they would send their clerk around,
      with an affidavit, for him to sign, within the next few days" and
      that "[a] few days later a clerk approached him with an affidavit[,]
      [a]n alteration was made and he signed it " Mr. Ginsberg points
      out that Ms Pillsbury had no "clerk." He argues, therefore, that
      one must, at the very least, conclude that this was a false
      statement on Ms Woodward's part and, thus, on Mr Griffith's part
      as well

144   On January 11, 2006, Ms Nicolosi spoke with Mr. Haskell   Mr
      Haskell recalled the incident   He recalled executing within days of
      the trial only one affidavit with a person whom he believed was a
      female paralegal/clerk of the lawyer for Mr Ginsberg. He was very
      surprised when informed that his affidavit was dated a year and a
      half after the trial

145.  When read the statements ascribed to him in the Woodward
      affidavit, Mr Haskell essentially confirmed their accuracy, with the
      exception that he does not believe he would have recalled the size
      of the woman, and he was not sure whether he said the woman
      had papers with her   He recalled she was sitting just behind the
      bar, but he had no recollection of her role in the trial   Mr
      Haskell's account of the location of the woman is consistent with
      Mr Ginsberg's and Ms Earnshaw's memory as to where Ms

47

Woodward sat throughout the trial.  Ms. Woodward says she sat at
counsel table   Mr  Ginsberg recalls Ms  Norris sitting in the back
of the courtroom

146   It is worth noting that Mr  Haskell's recollections relate to events
occurring several years ago and that, while somewhat unusual, the
events were of no particular significance to him at the time
Moreover, the description of the woman provided by Mr  Haskell,
which may or may not have been affected by Ms  Woodward's
questioning of him some three years after the event, does not fit
Ms  Woodward's physical appearance; rather, it fits the physical
appearance of Tricia Norris

147   The statements of Mr  Ginsberg, Ms  Pillsbury, and Ms. Earnshaw
must be given significant weight   However, assuming *arguendo* it
is provable by clear and convincing evidence that Ms  Woodward's
affidavit was false, there is no evidence, other than the fact that
Ms  Woodward is married to and serves as the paralegal for Mr
Griffith, that Mr  Griffith had knowledge of or should have known
of the falsity of Ms. Woodward's statement

148   At the time of the alleged incident, Mr  Griffith was conducting a
cross-examination of Mr  Ginsberg and would have had his back to
Ms  Woodward   There does not appear to have been any
discussion between the attorneys and Mr  Griffith at or near the
time of the incident

48

## Improper Conduct With Diane Nazarenko

149.   Mr Ginsberg makes a similar accusation of misbehavior on the part of Ms Woodward in connection with the 1999 deposition of Ms Nazarenko. The claim is supported by Ms Nazarenko's affidavit dated July 11, 2001   Ms. Nazarenko states therein: "During the deposition, I was quite uncomfortable with the tone of the questions and the fact that Barbara [Woodward] kept making faces and reacting to what I said. I felt that this behavior was calculated to influence my testimony to discredit Arthur."

150.   During Ms Nazarenko's October 2001 deposition, however, she was asked by Ms. Hantz to expand on the allegedly offensive conduct   She described being very uncomfortable during the deposition, and a "little more intimidated" than when she was interviewed by Mr. Griffith and Ms. Woodward at her home. She listed a combination of factors that caused her discomfort: sitting at the end of a table across from a video camera and Ms Woodward; being alone with "no one on her side" or with whom she was familiar; the eye contact and body language of Mr Griffith, in that he repeated the same question three or four times despite what she thought was an adequate answer; and that they were "clearly disappointed" when they did not get the answer they wanted

49

151. Contrary to Mr Ginsberg's claim, Ms Nazarenko did not ultimately believe that her testimony was affected by Ms Woodward's behavior When asked to describe Ms Woodward's conduct, she said: "Just mostly looking at me She was just kind of – she just reminded of my mother ", and she was "kind of rolling eyes, or, you know, talking to [Mr Griffith]" Although the behavior Ms Nazarenko described is unprofessional and certainly impolite, it is not directly attributable to Mr Griffith It is not even clear that Mr Griffith would have been aware of Ms Woodward's conduct The discomfort Ms. Nazarenko felt during the deposition is consistent with what many witnesses feel when subjected to questions in a formal testimonial setting

152. The same could be said for the discomfort Ms Nazarenko felt during the interview at her home that predated the deposition Ms Woodward accompanied Ms Wilson to Ms Nazarenko's Vermont home Mr Ginsberg complains that Ms Woodward misled Ms. Nazarenko to believe Ms Woodward was a business associate of Ms Wilson However, Ms Nazarenko makes clear that there was no affirmative misrepresentation Ms Woodward was introduced as "Barbara" and Ms Nazarenko made an assumption as to her role. The faultiness of this assumption was quickly apparent when Ms Woodward began discussing the divorce

153   Mr Griffith then joined his wife in the Nazarenko home without
invitation, but without apparent objection   Mr. Ginsberg asserts
that Ms Woodward and Mr. Griffith pressured Ms. Nazarenko to
testify against Mr Ginsberg by making false statements about him
and his actions during the divorce   Specifically, according to Mr.
Ginsberg, they told Ms Nazarenko that Mr Ginsberg was crazy
and was out to take everything from Ms. Wilson   Mr Ginsberg
disagrees adamantly with these characterizations of him,
particularly at the stage of the proceedings when the Nazarenko
home visit took place

154   Ms. Nazarenko's deposition testimony belies Mr Ginsberg's
contention that Mr Griffith attempted to get Ms Nazarenko to
testify falsely against him  She testified:

> I mean, I think they were --- they were – They didn't
> say, "Will you testify this way?"  But what they kept
> saying was that he was crazy and that he wanted her
> to have nothing and that he was being vengeful and
> the kids – you know, that there's no way he was going
> to let her have the kids, and that they were her kids
> and that she should be able to have joint custody and
> things like that

In answer to the question as to whether the Griffith/Woodward

characterization comported with her beliefs, Ms. Nazarenko

testified:

> I --- The way that they were characterizing it seemed to
> me to be a totally one-sided view of what was going on
> It was --- You know, I think --- I think that there were

51

> some bits and pieces of all of it that had some validity,
> but it certainly wasn't the overall – the whole story
> And I – I couldn't jump in on the pieces

155    What can be said of Mr Griffith is that he aggressively advanced a

one-sided and often extreme view on behalf of his client   Although

it is somewhat unusual for a lawyer to travel to Vermont to

interview a witness, it cannot be said that this is misconduct or in

any way inappropriate   In fact, it could viewed as diligent

representation of a client   Assuming *arguendo* the statements

made were to encourage an out of state witness' cooperation, they

reflected Ms Wilson's characterizations of her husband's conduct,

not statements or misstatements of fact by the attorney

### False Statements that Ms. Wilson Invested
### Her Inheritance in the Company

156    Throughout the proceeding, both in pleadings and in testimony,

Ms Wilson made statements that she invested gifts from her family

and her inheritance(s) in Mr Ginsberg's business   In fact, in Mr

Griffith's answer to the instant complaint, he stated: "Ms Wilson

brought to the marriage a sizable inheritance and a nursing

degree "  Although not a complete recitation, some of the

statements made through counsel about the gifts and

inheritance(s) follow   Mr Ginsberg was invited to supplement the

list if he wished

157. On July 14, 1999, Mr  Griffith filed the <u>Amended and Verified</u>
<u>Motion for Continuance and Extension of Time for Discovery</u>
discussed previously  In paragraph 2, Mr  Griffith wrote: "The
companies were started in the last ten years, by the Respondent
and a partner  Petitioner provided financial help for the venture by
way of large financial gifts from her grandfather "

158  On July 20, 1999, Mr  Griffith filed a <u>Motion to Compel Answers to</u>
<u>Interrogatories</u>  In paragraph 11, Mr  Griffith wrote: "She invested
her time and her inheritances into the start up of these
companies "

159. On August 4, 1999, Mr  Griffith filed a <u>Motion to Allow the Sale of</u>
<u>Assets</u>. In paragraph 4, he wrote: "The petitioner has had one
inheritance which went to help support the family, and, for the last
three years, her grandfather, Miles Pennybacker, gifted $60,000
per annum to the family which was used by the family for living
expenses while the Respondent and his partner developed software
businesses in the video conferencing business[ ]"

160  On October 4, 1999, Mr  Griffith filed a <u>Motion to Allow Witnesses,</u>
<u>in Addition to Those Listed in the Pretrial Submissions, to Testify</u>
<u>at Trial</u>  In paragraph 12, he stated: "Petitioner has contributed
substantial resources in terms of family gifts, personal assets and
personal effort as bookkeeper on behalf of these companies[.]"

53

161.  On August 25, 1999, Mr Griffith filed an *Ex parte* Emergency
      Motion to Compel. In paragraph 2, Mr. Griffith wrote: "The
      principal marital assets are two software businesses of which the
      Respondent is half owner and president  The Petitioner has
      invested over $200,000.00, which was gifted to the family by her
      grandfather, has devoted her time and energy to do bookkeeping
      for the companies . . ."

162.  Ms. Wilson swore to the truth of all the facts in the above
      pleadings.

163.  On October 12, 1999, Mr. Griffith submitted a Structuring
      Conference Memorandum. In paragraph 2, summarizing Ms.
      Wilson's anticipated testimony, he wrote:

> [She i]s expected to testify concerning the assets that
> she brought to the marriage; the profit made on the
> sale of various homes, which were purchased using
> her funds; and that this money as well as $200,000
> more that she had received in inheritances and gifts
> were also used for living expenses during the marriage
> and as seed money to start D.A.S. Visual Media
> Corporation and Empire Multimedia Corporation.

In his exhibit list, Mr. Griffith included: "Records of inheritances

and gifts received by Petitioner during the marriage."

164.  On December 12, 2001, at a post-trial hearing, Ms. Wilson testified
      as follows:

> Mr. Griffith:      Okay. Now your grandfather gave money
>                    for the use for the children for some time,
>                    correct?

54

| | |
|---|---|
| Ms Wilson: | Yes, my grandfather gave money to the children and to myself, and also to Arthur |
| Mr. Griffith: | And now, what happened to the money that was given for the children? |
| Ms Wilson: | The money that was given for the children went to a variety of places  Some of it went to the Oakmark funds, some of went to the Kaufman funds, some of it was spent at the time on allowing – to allow the children to go to camp, which was quite expensive.  And at the time also when we received these funds, Arthur did not agree with me to put aside all of the funds where they would be set aside for the children  He insisted that we needed the funds in our bank account in order to continue to operate the family while he worked on growing the business, and so they went into our general living expenses and into investing in the business |
| Mr. Griffith: | Have you made a good faith effort to answer the interrogatories propounded by Mr Ginsberg? |
| Ms Wilson: | I absolutely have  What's a question is where – I feel like I'm being put on trial for my financial situation, which, yes, I have accountability for my own financial situation, but he is trying to defraud me out of my inheritance  He and his partners are in cahoots and trying to con—to defraud me from my inheritance, and I can't be responsible for that, and I cannot be responsible for them mismanaging their company, which was started with my inheritance  If it wasn't for the money that I had, they wouldn't have that company, either one of 'em |
| Mr  Griffith: | -- Now, why would you want to have the stock [of one of the respondent's companies] rescinded? |

55

> Ms. Wilson:       Because that was my security
>                   that I would actually get $200
>                   thou-- $200,000 dollars as my
>                   share of the companies, which I
>                   feel I'm entitled to not only as a
>                   spouse, but also because I was a
>                   major financial investor

165   Ms. Hantz objected to Ms. Wilson's statement about "this financial

      investment," and insisted that a foundation be laid for the claim.

      She noted; "[W]e've had a lot of this, which again is – has all been

      gone over at trial, and there's no finding in the final order about

      this 'financial investment' piece " Allowing the testimony, the

      Court found that it was the witness' "opinion" and stated further:

      "I -- quite frankly it's nothing I –it's not relevant, and I – you know,

      it's been gratuitously thrown out periodically here, and I'm not

      paying any attention to ıt."

166   Mr Ginsberg challenges the truthfulness of these statements, first,

      because he asserts that Ms. Wilson received her only inheritance

      after the parties' separation, and thus, it was not available at the

      time the companies were started; and secondly, because no

      monetary investment was ever made in the company - it was

      started with his and his partner's labor after work hours in his

      home.  Mr  Ginsberg claims that Mr  Griffith would have known of

      his client's falsehoods because he was privy to the financial

      statements of the companies, which reflected no capital

      investment   He also contends that, because Ms  Wilson's

statements were so inconsistent, at least one was clearly a lie

167. In December 2001, Ms Wilson testified:

Ms. Hantz:    Final thing: Do you have any
              documentation on this concept of
              the investments that you made in
              the business?

Ms. Wilson:   Well, unfortunately, no   I handled
              this in the same trusting way that I
              handle many other things. The
              business was basically formed on a
              handshake. The business was
              started with David, Haemi, Arthur
              and me sitting down – at the time
              with some other people and
              agreeing to go forward with this
              business. David never recognized
              the financial contributions that our
              family made – and when I say "our
              family," I'm referring to Arthur and
              me.

                        * * *

Ms Hantz:     Are you aware –

Ms. Wilson:   So no, there is no paper trial that that
              documents this, unfortunately

Ms Hantz:     -- and are you aware that Seelye &
              Schultz pegs each original shareholder's
              capital investment at $2,000 dollars a
              piece?

Ms Wilson:    And that is just totally for paper purposes.

168   Mr. Griffith, in his interview with Ms. Nicolosi on April 7, 2006,

admitted he was unclear as to the source of the money Ms  Wilson

brought to the marriage. He believed that Ms. Wilson and her

brother had trusts established, which funded their college tuition

57

and Ms. Wilson's purchase of a Vermont home when she was in

college. He also recalled that her father died when she was a teen.

He noted that the gifts from Ms Wilson's maternal grandfather

were part of an estate plan from which the Ginsberg family greatly

benefited over the years   Other than the testimony of his client,

Mr. Griffith had no specific facts about an inheritance received

during the marriage

169   However, after further research, on April 18, 2006, Mr. Griffith

produced a faxed memorandum from Ms. Wilson to him, dated

November 6, 1999, in which Ms Wilson outlined Mr. Ginsberg's

and her "Earnings History" from 1981 to 1990.  Contrary to Mr.

Ginsberg's claims, she indicated that in 1986 she received an

"Inheritance from Wilson Grandparents [in the amount of]

$32,000."

170.  This memorandum and Ms. Wilson's sworn statements provide a

sufficient basis for Mr Griffith's allegations and argument  It is

not improper for a lawyer to rely on the word of a client even if it

contradicts other evidence presented and even if in the end the

court does not accept the client's version.  Ms. Wilson's veracity

was subject to cross-examination about any inconsistencies in the

pleadings.  The general point made by Ms. Wilson and her lawyer

is consistent throughout – that is, her family money greatly

benefited the Ginsberg family and the development of the software

58

business, for which she believed she should receive credit

### Assault Allegation

171. Mr. Ginsberg claims that Mr. Griffith misrepresented in pleadings that he "assaulted" Alyssa. The relevant facts are summarized below.

172. According to Mr. Ginsberg, on October 11, 2000, his daughters, then 11 and 14 years old, had an argument that led Mr. Ginsberg to send both girls to do a "time out" in their rooms. His youngest daughter, Alyssa, cursed at him   He waved his finger in front of her face and told her never to speak to him that way again   She hit his hand. He slapped her hand back

173   On October 22, 2000, Alyssa called Mr. Ginsberg and told him that she would not return to his house. Because of her disrespectful tone, he hung up. Alyssa called back an hour later and said that the police were at her mother's condo and wanted him to come over to work things out   Alyssa also said that the police and Attorney Griffith said she could stay with her mother for a week. Mr. Ginsberg did not go over to the condo

174. On October 25, 2000, Mr Ginsberg filed a motion for contempt, alleging that Ms. Wilson was alienating Alyssa from her father and older sister   Therein, he referenced the above events as partial support for his contempt claim, alleging in paragraph 19 that "[i]t appears that the Petitioner called the police and either lied by

59

telling Alyssa that she should call her father because the police wanted to talk with him, or Alyssa was an active participant in this plot."

175  On November 6, 2000, Ms. Wilson, through Mr. Griffith, filed a verified objection to the contempt motion. According to Mr. Ginsberg, the objection contained misrepresentations of fact for which Mr. Griffith should be held accountable under the Rules of Professional Conduct.

176. In paragraph 15 of the verified objection, Ms. Wilson responds, "It is not Petitioner who struck an 11 year old child in anger " In paragraph 16, Ms. Wilson outlined the version of events of October 11 as purportedly told to her by Alyssa:

> [O]n October 11, 2000 there was a heated argument between Alyssa and Respondent when Alyssa requested help with her homework from Respondent. Respondent said he was too busy. Alyssa insisted that she needed help because she would get into trouble at school the next day. Respondent lost his temper and dragged her up stairs to her room. After more arguing, he struck Alyssa on the shoulder. This came as a shock to Alyssa because she had never been hit by her father before.

177. Ms Wilson further averred that the following weekend, Alyssa refused to return to her father's house because of her "fear of her father." Alyssa called her father, who said he would come over to talk. Ms. Wilson claimed she called the police to serve as a "neutral observer" because she did not want to be alone with Mr

60

Ginsberg due to "prior dishonest criminal allegations." [5] She

claims that Mr Ginsberg refused to come over when he learned a

police officer would be there.

178   Mr. Ginsberg claims that additional misrepresentations appeared

in Ms. Wilson's January 23, 2001, Emergency Motion for Change

of Custody. Therein, she alleges that Alyssa told her "that during

the summer and fall, there was an escalating level of hostility and

violence developing between her and Respondent." She further

alleges that "the hostility, psychological violence      continued to

escalate alarmingly according to Alyssa " Ms. Wilson characterizes

what was occurring in the father's home as "psychological trauma"

requiring Alyssa to be on psychological medication and causing her

to need mental health counseling. Ms. Wilson again gives the

following account of the October 2000 incident:

> 10   On or about October 11, 2000 there was another
> bad argument between Alyssa and Respondent
> Respondent lost his temper and dragged her
> upstairs to her room. After more arguing, he hit
> Alyssa on the shoulder, causing her pain and
> scaring her
>
> 11   The next weekend, during a visitation with
> Petitioner, Alyssa refused to go back to
> Petitioner's house, stating she was fearful of her
> father's short temper and possible further
> violence

---

4 Mr. Ginsberg takes issue with the assertion that he had Ms. Wilson arrested in September of
1999 or that there was any dishonesty on his part in connection with her arrest   This issue is
discussed supra at pp. 37 - 39.

> 12.   Since Respondent refused to talk with Petitioner,
> Petitioner asked Alyssa to call Respondent to try
> to get things straightened out   Respondent said
> he would come over to the Petitioner's to talk
> with Alyssa   Petitioner called the Nashua police
> for an officer to act as a neutral observer
> Respondent refused to come to talk with Alyssa
> when he learned that there would be a police
> officer there

179.  Mr Ginsberg disputes Ms. Wilson's version of the events.  He relies

in part on inconsistencies found in Alyssa's prior report to the

GAL

180   On October 16, 2000, Ms Earnshaw, the GAL, spoke with Alyssa,

Elizabeth, and Mr. Ginsberg.  According to Ms Earnshaw's notes,

Alyssa recounted a version of the events that was relatively

consistent with the representations made by Ms Wilson in her

pleadings   Alyssa told Ms Earnshaw that she and her father

argued about homework and her ultimate refusal to go to her

room   She said her father dragged her upstairs and down the

hallway.  She said that after she ran into the upstairs laundry

room, he dragged her across the floor   He pointed to her and said,

"you better take me seriously."  Mr Ginsberg hit her on the side of

the shoulder.  Alyssa later said he didn't drag her upstairs, but

rather pulled her to a standing position and hit her "below the

shoulder" when she was in her room.  She also said the policeman

asked her to call her dad and gave her permission to stay the week

with her mother   Alyssa told the GAL that she and her dad argue

62

every day and that she desired to stay with her mother for two
weeks, so she and her dad could "cool down"

181   Mr. Ginsberg also says he learned from the responding officer that
Ms Wilson tried to have him arrested for assault in connection
with this incident   Ms Wilson denies the allegation.

182   On July 20, 2001, the Nashua police officer, Daniel Archambault,
was deposed   Although Officer Archambault admitted that he may
have told Mr. Ginsberg that he was called to a report of an assault,
upon review of the police records, he testified that the call was not
for a criminal investigation, but was for advice   He confirmed that
he would not have told Alyssa to call her father to come over, nor
would he have authorized her to stay with her mother for a week
The officer also expressed his view that the incident was a matter
of parental discipline and not one of assault

183   On July 13, 2001, the day of the motions hearing, Mr Griffith filed
a memorandum in support of his pending motion for a change of
custody   Therein, he acknowledged the differing characterizations
of the incident as earlier reported and represented in pleadings,
of the incident "as either the 'homework incident' or the
'hitting incident' again depending on the person's point of view"

184.  Without a doubt, Mr Ginsberg's version of the events is very
different than Ms. Wilson's version   That difference does not, as
Mr. Ginsberg suggests, support a finding of misconduct on the part

63

of Mr Griffith

185. Assuming there is merit to a claim that Alyssa lied about some of
the facts of the October incident and her contacts with the police,
or even that Alyssa's account was influenced by her mother's lies
or misrepresentations, there still is no ethical culpability on the
part of Mr Griffith  Ms Wilson attests under oath to the facts
contained in the pleading.  It is clear she read and approved the
pleadings prepared by Mr Griffith because she made a substantive
change to one sentence and initialed it   Most of Ms Wilson's
assertions are based on conversations with Alyssa to which Mr
Griffith was not privy and which are corroborated in large part by
Alyssa's statement to the GAL   While Mr Griffith was alerted to
differences in the accounts, there is no reason to find he knowingly
presented false evidence or misrepresentations to the court

**Knife Threat**

186  Mr Ginsberg complains that in an <u>Emergency Motion to Change
Custody</u> and pleadings related thereto Mr Griffith made false
assertions that Mr Ginsberg threatened Alyssa with a knife in
August 2000  The relevant facts are summarized below:

187  On November 6, 2000, in response to Mr Ginsberg's October 25,
2000, motion for contempt, Ms Wilson filed an objection and an
emergency motion for a psychological evaluation.  In it, she stated
under oath:

64

> 15.   Petitioner denies the allegations contained in
>       paragraph 15. It is not the Petitioner who has
>       threatened an 11 year old child with being cut
>       with a knife.

188   On November 20, 2000, Mr. Ginsberg denied that he ever

threatened Alyssa with a knife.

189.   On January 25, 2001, Mr Griffith filed the <u>Emergency Motion for</u>

<u>Change of Custody</u>. Therein, Ms. Wilson gives the following

account of the August incident:

> 4     On or about August 27, 2000, Alyssa drove her
>       scooter onto the driveway which had been
>       freshly paved. Respondent became furious,
>       shouting at her. He grabbed her and held her
>       and forcibly pushed a bowl against Alyssa's arm.
>       When she screamed at him to stop as he was
>       hurting her, he pushed harder and threatened,
>       "if this was a knife it would really hurt."

> 5     This threat by Respondent so terrified Alyssa
>       and she was in a state of shock.

190.   On February 2, 2001, Mr Ginsberg objected to the <u>Emergency</u>

<u>Motion for Change of Custody</u> and filed an affidavit outlining his

version of the August 27, 2000, incident. Mr. Ginsberg denied that

that there was any screaming, threat or harm to Alyssa, or that

there was any issue with his relationship with Alyssa in the

summer months   He further alleged that Petitioner and her

counsel, by their false allegations, had violated the rules of court

and the <u>Rules of Professional Conduct</u>, Rules 3.1, 3.3(a)(1) and

3.3(a)(3), and sought sanctions. Mr. Griffith responded with a

request that the court issue a protective order prohibiting further accusations of professional misconduct in the context of the divorce proceeding.

191. Prior to the filing of any related motions, the August 27, 2000, incident had been the subject of a GAL interview. On August 28, 2000, the day after the incident, Alyssa met with Ms. Earnshaw. Ms Earnshaw's notes reflect the following: "Alyssa said that her father told her not to ride her scooter on a freshly paved driveway. She questioned why when his car was parked there. She said that her father then got a bowl and pressed the bowl firmly on her arm He said what happens and she said it doesn't go through and he said what if this was a knife and she said it would go through" The notes further reflect the following information: Alyssa said that "[s]he was not comfortable being around [Mr. Ginsberg] because he pushed the bowl firmly vs. her arm It really scared her. She called her mother – she said she wishes she could help me. Alyssa was in shock and in tears He didn't hurt her physically, it was a mental thing." Alyssa felt her relationship with her father was bad and wished to stay with her mother

192. In the hearing memorandum filed on July 13, 2001, Mr Griffith again acknowledges the differing views of the parties and refers to the August 2000 incident as "the 'knife threat incident' or the 'tupperware bowl incident' depending on the person's point of

66

view."

193.  Mr. Ginsberg says that, on direct examination, Ms. Wilson testified

to the presence of a knife and then recanted this falsehood on

cross-examination   Mr. Ginsberg also says that she finally

admitted during cross-examination that there was no threat with a

knife at all [6]

194.  Mr. Ginsberg faults Mr. Griffith for not correcting the record.

However, Ms  Wilson had always described the incident in her

filings as an implicit threat, not one that physically involved a

knife. There is no evidence that Mr. Griffith would have been

forewarned by his client of the variance in her testimony.  In any

event, even if Ms. Wilson admitted lying in her testimony or that

she lied in a previously filed pleading, the court would have heard

the admission.  Mr. Griffith was not obliged to take further steps to

correct the record.

195.  On July 17, 2001, the Emergency Motion for Change of Custody

was denied.  While the court did not comment on the alleged

mischaracterizations of the incident, the ruling suggests the court

found no merit in the claim   The court found that Alyssa's desire

---

[6] Mr. Ginsberg insists that the transcript of Ms  Wilson's testimony must be obtained to properly evaluate his professional conduct complaint.  Ms. Nicolosi disagreed because, as she correctly concluded, the focus of this inquiry is not on the veracity of Ms  Wilson but on that of her counsel

to live with her mother was attributable to her mother's lack of

structure and discipline   The court further opined that:

> Each party blames the other for the children's
> emotional problems, unacceptable behavior and poor
> performance in school  Neither party seems to realize
> that the extremely bitter and contested divorce
> proceeding and the continued acrimony between the
> parties are probably responsible for their children's
> problems  Until the parties cease their marital
> warfare, their children can be expected to struggle
> emotionally and exhibit unacceptable conduct

196.  The Court granted Mr  Griffith's request for a protective order

Judge Groff went further and stated:

> The respondent claims that the petitioner's counsel
> has violated the Code of Professional Conduct by
> maliciously making false allegations and
> misrepresentations in his pleadings   The Court has
> heard the evidence and finds no such misconduct   In
> any event, the respondent should pursue the issue
> through the Professional Conduct Committee and not
> in the Superior Court

197   On July 30, 2001, Mr  Ginsberg persisted and requested a specific

ruling on his request for sanctions, given what he claims were the

"admittedly inaccurate allegations contained in Petitioner's Motion

for Change of Custody "  He specifically mentioned Ms  Wilson's

supposed admission during the hearing that there had been no

threat with a knife   On August 20, 2001, the court denied his

request.

198   No conclusion can be drawn based on this record that Mr  Griffith

knowingly misrepresented facts in his pleadings or submitted false

evidence. Ms Wilson's version of the "knife threat" incident was based on the hearsay statement of Alyssa to Ms Wilson. Ms Wilson attested to her conversations with Alyssa. Again, Mr Griffith was not present for the conversation between mother and daughter. Alyssa's version of events, as told to Ms Earnshaw, although certainly less extreme and dramatic, is sufficiently corroborative of her statements to Ms Wilson to support the pleadings

### Conspiracy To Deceive Court

199. Finally, Mr Ginsberg contends that all of the allegations in his complaint, when considered as a whole, demonstrate that Ms Wilson and Mr Griffith conspired in a course of conduct to deceive the court

200   Mr. Ginsberg provided voluminous documentation and oral explanations regarding the alleged conspiracy   Although Ms. Nicolosi considered all of the submissions as potential evidence of the alleged conspiracy, Ms Nicolosi only considered and analyzed as actual professional misconduct complaints those allegations that were expressed in writing   Numerous times, Ms Nicolosi advised Mr. Ginsberg to put any additional complaints in writing to allow Mr. Griffith to respond

201   Undersigned counsel concurs in Ms. Nicolosi's conclusion that a claim of professional misconduct (in the form of the alleged

69

conspiracy) which, standing alone, is not supported by clear and convincing evidence of the necessary elements of violation, cannot be combined with other nonmeritorius claims to satisfy that burden of proof

## **B.  Complaints Warranting A Warning**

202   The following complaints give rise to a serious concern as to accuracy of Mr Griffith's pleadings and the care with which they were drafted   Although all of the statements about which Mr Ginsberg complains are either based on the sworn statement of Mr Griffith's client or on some documentary proof, certain conclusory statements are exaggerated or sufficiently inaccurate that they come close to misrepresentations   A lawyer must bear some responsibility, particularly in the family law arena, to temper and address the emotionality and imprecision of clients' memories when drafting pleadings on their behalf

### **Allegation of Mental Defect**

203   Mr  Ginsberg complains that in various pleadings, Mr. Griffith suggested that Mr. Ginsberg suffered from a mental defect

204   In Mr  Ginsberg's October 25, 2000, motion for contempt, Mr Ginsberg stated in paragraph 19:  "It appears that the Petitioner called the police and either lied by telling Alyssa that she should call her father because the police wanted to talk with him, or Alyssa was an active participant in this plot."

70

205. On November 6, 2000, Mr Griffith filed an <u>Objection to
     Respondent's 10/25/2001 Motion for Contempt and Emergency
     Motion for Psychological Evaluation</u>  Therein, Mr Griffith wrote:
     "The allegations in paragraph 19 [of Respondent's motion] that his
     eleven year old daughter and Petitioner conspired to set him up for
     an arrest are classic signs of paranoid personality disorder " The
     paragraph is footnoted as follows: 1  "They suspect on the basis
     of little or no evidence that others are plotting against them and
     may attack them suddenly, at any time and without reason. DSM-
     IV, at 634 (4th ed  1994)'." In paragraph 22, Mr Griffith wrote:
     "[I]n paragraph 22, the allegations are unfounded, preposterous
     and outrageous and are further evidence of a severe personality
     disorder. * * *  Petitioner is deeply concerned as to the
     psychological wellbeing of the Respondent's household, because of
     the bizarre actions of Respondent."

206. On November 8, 2000, Mr Griffith filed an <u>Objection to
     Respondent's Further Motion for Contempt</u>  In paragraph 8, Mr.
     Griffith wrote: "Respondent's continued obsession with this matter
     and Petitioner's finances, is of concern to Petitioner.  It is clear
     evidence of: . .  3. a personality disorder which is unhealthy for
     the children to be exposed to on an ongoing basis." In paragraph
     10, he wrote: "This assumption of a conspiracy between Petitioner
     and other unnamed and unknown individuals, in order to

71

establish that Petitioner is somehow hiding money from him, even though no evidence exists to support this expectation, is a further example of paranoid personality disorder " The paragraph is footnoted as follows: "1 American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 634 (4th Ed 1994) "

207 In paragraph 11, Mr Griffith wrote: "Paragraph 10 is nothing but outrage over his own fantasies It again confirms that Respondent has been a party to discussing the divorce with the children, in contempt of Court, as well is a further demonstration of a personality disorder, which, if confirmed by a competent psychological evaluation, would constitute a harmful atmosphere in which to raise the children " Mr Griffith reiterated his client's request that the family undergo a family psychological evaluation. The court found no merit in the request and denied such relief

208 On February 8, 2001, Mr. Ginsberg filed a motion for contempt alleging in pertinent part that his ex-wife violated the final court decree by consuming alcohol in the presence of the minor children on January 28, 2001, at her surprise birthday party and on February 1, 2001, at a restaurant bar in Nashua The witnesses to the events were not named On February 16, 2001, Mr Griffith filed his client's attested-to objection to the motion for contempt Contesting the alcohol claims he wrote:

72

B    The Motion clearly indicated that the respondent
is engaging in a course of conduct directed at
petitioner which includes character
assassination, interfering with her relationships
with others, interfering with her occupation,
depleting her financial resources, stalking,
spying and filing motions aimed at controlling
her conduct, in order to inflict emotional
distress. **This is psychological terrorism.** .    .

It is further evidence of **respondent's mental
instability**

(Emphasis added).

209   Mr. Ginsberg was understandably upset by Mr. Griffith's advocacy.
However, in fashioning his basic position on the issue, Mr. Griffith
relied on facts attested to by his client and he framed his
assertions in the context of Mr. Ginsberg's actions in the litigation.
Mr. Griffith's comments were also made in the context of an
ongoing request for a family evaluation   Cf. In re: Bruzga's case,
145 N.H. 62, 68-70 (2000) (lawyer as *pro se* litigant and affiant
made grossly exaggerated statements about his ex-wife's mental
health in the context of a child custody proceeding.)

210.  While Mr. Griffith did not engage in misconduct, a warning is
warranted as set forth below

### Stalking Charge

211.  In another claim, Mr. Ginsberg focused on additional allegations
contained in Mr. Griffith's February 16, 2001, objection to the
motion for contempt.  As previously indicated, Ms. Wilson swore to
the facts stated in the objection.  Contesting the alcohol claims,

73

Mr Griffith wrote:

B       The Motion clearly indicated that the respondent
        is engaging in a course of conduct directed at
        petitioner which includes character
        assassination, interfering with her relationships
        with others, interfering with her occupation,
        depleting her financial resources, **stalking**,
        **spying** and filing motions aimed at controlling
        her conduct, in order to inflict emotional
        distress **This is psychological terrorism.**

                        * * *

C       Petitioner is fearful for her life and safety based
        on the threats implicit in respondent's motion
        together with: respondent's earlier claims that
        she and others are conspiring against him; his
        relentless persistence in filing motions aimed at
        controlling her activities, and not allowing her to
        live a private life away from him

(Emphasis added)   The prayers for relief associated with the

objection included a request that the court "[o]rder the respondent

to **cease stalking or following the petitioner**, or threatening to

do so[ ]"  (Emphasis added)

212.  Ms. Wilson eventually conceded she had violated the court order

      by consuming alcohol in front of the children   Throughout the

      case, Ms Wilson vehemently argued in response to Mr Ginsberg's

      various motions that her consumption of alcohol in the presence of

      the children was not harmful to them.  Judge Groff apparently

      agreed and imposed no sanctions   Finally, in July of 2002, ruling

      on another motion for contempt filed by Mr. Ginsberg, Judge Groff

      determined that Ms. Wilson had no problem with alcohol and was

                              74

not required to participate in alcohol counseling

213   Mr. Ginsberg's claims that Mr  Griffith persisted in this false
      accusation of stalking even after he learned that there was a
      witness to Ms  Wilson's drinking at Michael Timothy's   Mr  Griffith
      represents that he does not believe he learned about this witness
      until after he had filed his pleadings   Mr. Ginsberg claims,
      however, that Mr  Griffith had been so informed by Ms  Hantz early
      on

214   In any event, Mr. Griffith says in essence that the
      characterizations, such as "stalking," "spying" and "psychological
      terrorism," accurately reflected his client's general feeling that Mr.
      Ginsberg was trying to monitor her life, to interfere with her ability
      to move on, and to bring her back into court for insignificant
      things at great emotional and financial cost   Although the
      language is extreme under the facts alleged, Mr  Griffith's
      assertions were made in the context of Mr  Ginsberg's conduct in
      the contempt litigation and, according to Mr  Griffith, accurately
      reflected his client's emotionally-charged reaction to such conduct

215   One can certainly debate whether Mr. Griffith's language was
      necessary under the circumstances.  Just as he had been  in
      connection with other hotly contested issues, Mr. Griffith was
      overly vigorous in presenting his client's position here   Mr
      Griffith's conduct as an advocate, however, does not warrant

75

sanctions

216   Although the aforementioned complaints associated with Mr
      Griffith's November 2000 and February 2001 pleadings do not rise
      to the level of professional misconduct, they do raise serious
      concern about Mr Griffith's judgment in responding to the
      demands and claims of his client and his tendency to draft
      pleadings using a highly inflammatory tone.

217   Mr. Griffith's characterizations of Mr Ginsberg as a stalker, a spy,
      a psychological terrorist, and a mentally unstable person reflect a
      lack of civility and basic decency.  Granted, the assertions were
      made in an effort to vigorously defend a client's interests in
      responding to motions filed by an aggressive opponent in an
      emotionally-charged family dispute.  However, regardless of the
      circumstances confronting a litigant in this sort of proceeding, and
      particularly where mental illness is not an issue, counsel should
      refrain from such hyperbole

218   Mr. Griffith should be warned to exercise greater care and more
      thoughtful discretion in avoiding the use of such language and
      tactics in his pleadings and other presentations to the court.

**Misrepresentation Concerning 1999 Income**

219.  Mr. Ginsberg claims that Mr. Griffith misrepresented facts
      concerning Mr Ginsberg's financial condition.  Specifically, on July
      15, 1999, less than one month after Mr. Griffith took over the case

76

from Mr. Durkin, at a hearing on a motion to quash a deposition

subpoena he issued to Mr Kahan, Mr Griffith made the following

statements:

| | |
|---|---|
| Court: | Why do you want to involve Mr Kahan in this domestic proceeding? |
| Mr. Griffith: | It is upon information and belief that there is a suggestion that properties belonging to these corporations, that are owned by these people, have been transferred to another corporation of Mr Kahan, and I want to explore that. There is also - - the Court who made that suggestion. |
| Mr Griffith: | Excuse me. |
| Court: | Who's suggestion is that? |
| Mr. Griffith: | This is what we have heard  I know there have been other - - there are other documents - - and I hate to give my whole case away, but, okay, fine.  Your honor, there have been other documents that I have seen which show that this corporation - - or, these corporations have products, now, it has been represented in court by Attorney Pillsbury that there are no products; this is strictly a service company. What happened to those products? I want to know, and that is what I want to know from Mr Kahan.  I also want to know, as far as the value of this company - - it has been asserted, again, by an unsigned support financial affidavit, at the time of the temporary hearing, that this company is a service company and has a $60,000 value of his share of it - - Mr. Ginsberg's share |

77

of it. This is a company that he earned, by his own admission, from $240,000 on last year. **I think the evidence we have gotten more recently will show that, in fact, he has earned a lot more than that and is earning close to half a million dollars this year.** I want those records. He says he doesn't have those records, Mr. Kahan has those records. . . .

But in any event, in this case the important thing is that the truth come out as opposing to coming out later on and **having another trial on fraud**--which is going to keep everything going forever, as you well know.

Court:         Shafmaster.

Mr. Griffith:  Yes.

(Emphasis added).

220. Mr. Griffith had also asserted in a pleading that "Respondent fraudulently understated his assets to the Court."

221. Despite Mr. Griffith's having raised the spectre of a "fraud" on the court, the court granted Mr Ginsberg's motion to quash the Kahan deposition. Nonetheless, Ms. Pillsbury, on behalf of Mr. Ginsberg, was understandably concerned about Mr. Griffith's "fraud" allegation and demanded that Mr. Griffith show support for the allegation.

222. Mr. Griffith did not disclose the basis of his "fraud" allegation until July 28, 1999, at a further hearing on discovery issues. Mr.

78

Griffith clarified that his "fraud" allegation was based on Mr.

Ginsberg's failure to include the stock options as assets in his

most recent financial affidavit. At that hearing, Mr Griffith

explained that he was relying upon the D A.S. Business Plan for

his assertion that the stock options had value

223    Page 37 of the D A S Business Plan states in relevant part:

### Notes to 1997 Income Statement

2.    *Form of Income and Retained Earnings.* 1997
       revenues and retained earnings consisted of
       cash payments for product licenses and sales.
       Payments for contracted network design
       consisted of cash ($400,900) and **equity in a
       major client corporation (common share
       options valued at $542,500 at the end of
       1997)**. Equity in the Client Corporation was
       accepted in lieu of future product license
       payments, the flow and timing of which the
       company would have had little control over
       Options were distributed directly to D A.S
       employees involved in the project  D A S  does
       not make payments in equity a standard form of
       payment  Moreover, the company does not
       believe that equivalent pricing and all cash
       payment will impede its ability to compete for
       future contracts

(Emphasis added)

224    During a meeting with Ms  Nicolosi, Mr  Griffith explained that he

totaled the income from Mr  Ginsberg's financial affidavit and stock

options (as listed above) together as a projected estimate of 1999

earnings  In round numbers, Mr. Griffith took the approximate

value of the stock options and halved it (i.e , approx  $250,000.00)

to reach the amount Mr. Ginsberg would have earned in stock

options in 1997  Mr  Griffith then took that amount and added it to Mr  Ginsberg's stated earnings ($240,000.00) for 1999 to achieve the figure "one million "

225  At the July 28 hearing, Ms  Pillsbury explained that Mr  Ginsberg failed to include the stock options on his financial affidavit because the stock options were essentially worthless.  Ms  Pillsbury took extreme umbrage at Mr  Griffith's allegation of "fraud," and argued that, as Mr  Griffith had evidence that the stock options had no value, his "fraud" allegation was made in bad faith.  Ms. Pillsbury pointed out that Mr. Ginsberg had disclosed the value of the stock options in his answers to interrogatories, which Mr  Griffith had in his possession.

226  Mr  Griffith's response then and today would be that, while he had no hard evidence of the value of the stock options, he <u>did</u> have the D A.S  Business Plan, which valued them at approximately half a million dollars.

227  Mr  Ginsberg complains that Mr  Griffith's allegation that he committed fraud by understating his earnings by approximately one-quarter million dollars was a false statement designed to mislead the court to reopen discovery after the deadlines had passed

228  Mr  Ginsberg contends that Ms. Wilson admitted to Ms  Nazarenko that she knew the "fraud" accusation was not true.  Ms

Nazarenko, however, did not reveal Ms Wilson's admission to Mr
Ginsberg until after the divorce trial and she did not sign an
affidavit to this effect until July of 2001, when the statement no
longer had any materiality

229   Accepting Mr. Griffith's explanation as true, the passage on page
37 of the D.A.S Business Plan addresses the value of stock
options in 1997, not 1999  The factual predicate for Mr Griffith's
statement, "I think the evidence we have gotten more recently will
show that, in fact, he has earned a lot more than that and is
earning close to half a million dollars this year[,]" is unsound at the
very least.  Mr. Griffith had no evidence that Mr. Ginsberg had ever
exercised the stock options and/or realized any income from them
Further, Mr. Griffith had Mr. Ginsberg's answers to interrogatories
that disclosed both the existence of the stock options and,
according to Mr Ginsberg's assessment, the minimal value of
those options

230   Importantly, however, at the July 28, 1999, hearing, Mr. Griffith
clarified that his allegation was that Mr Ginsberg had understated
his assets, rather than his income  At this early stage of his
involvement, it appeared to Mr. Griffith, that, whether it was
remuneration through straight income or through income and
stock options as in 1997, Mr Ginsberg's net worth, given what was
represented in the D A S. Business Plan about D.A S 's bright

81

future, should have been greater than that disclosed on Mr.
Ginsberg's most recent financial affidavit   Mr Griffith's
assumption was that Mr Ginsberg's stock options in the company
were worth at least as much in 1999 as the D A.S  Business Plan
said they were worth in 1997.  The D A.S  Business Plan offered
some support for Mr. Griffith's position   Moreover, at the hearing,
Mr Griffith argued that the stated value of the stock certificates
was not a meaningful way to determine the actual value of the
stock options.

231   Ms Pillsbury argued at the July 28 hearing, and Mr. Ginsberg
continues to maintain today, that the D A S  Business Plan was
not a reliable source document   Mr Ginsberg states that the
D A.S. Business Plan was a "draft" document that was discarded
by his company and never used.

232   As Ms Wilson's advocate, however, Mr. Griffith was not required to
accept as true Mr Ginsberg's answers to interrogatories as to
stock value or his assertions as to the reliability of the D A.S
Business Plan   There can be no dispute that the D A S  Business
Plan, a document prepared for Mr Ginsberg and his partner and
at their request, lists the stock options as having a value of
"$542,500 00 at the end of 1997 "

233   The better course would have been for Mr Griffith to state the facts
more completely and objectively, i e , that the D A S  Business Plan

82

listed stock options in 1997 held by to Mr Ginsberg valued at approximately $250,000.00, but that they were not included in Mr Ginsberg's most recent financial affidavit.

234. Instead, Mr Griffith elected to characterize Mr. Ginsberg's conduct as "fraudulent" and, therefore, criminal in nature. Such a serious accusation was unwarranted, even with the D A.S. Business Plan in hand. Mr Griffith had access to all of the discovery that had been conducted and offered in the case, which included access to all financial records of Mr. Ginsberg's company Neither Mr Griffith nor Mr Durkin before him had yet acted on Mr. Ginsberg's offer to allow a complete review of the financial records Moreover, as part of Mr. Ginsberg's answers to interrogatories, Mr Ginsberg had disclosed the existence of the stock certificates in question Absent further inquiry, Mr Ginsberg's assertion as to their nominal value was entirely plausible.

235. According to Mr. Ginsberg, had Mr Griffith reviewed the D A.S. financial records available to him in advance of the July 1999 hearings, Mr. Griffith would have discovered that his "fraud" charge was a grave misstatement Notably, Ms. Pillsbury made this very argument in defense of the "fraud" allegation at the July 28, 1999, hearing.

236 Mr Griffith continues today to assert that the D.A.S. Business Plan was a reliable source document. On its face, it appears to be

83

a valid piece of evidence for Mr Griffith to have used in cross-
examination of Mr. Ginsberg on the credibility of his assertions
with respect to the value of the stock options   However, Mr
Griffith's reliance upon the D A S  Business Plan to make
accusations of "fraud" on the part of Mr  Ginsberg was
inflammatory, unnecessary, and probably negligent.

237    Much like Mr. Griffith's reckless characterization of Mr  Ginsberg
as a stalker, spy, and psychological terrorist, Mr. Griffith's use of
the word "fraud" to describe Mr. Ginsberg's conduct was a gross
exaggeration of the facts

238.   Because of the information appearing on page 37 of the D.A.S
Business Plan, however, Mr  Griffith's "fraud" allegation does not
rise to the level of an intentional misrepresentation   Nonetheless,
this Committee should issue a stern warning to Mr  Griffith to take
greater care in ensuring the accuracy of his oral and written
representations to the court, especially where, as here, he elected
to make serious accusations against an opposing party.

## III.  REQUEST FOR RELIEF

239    Supreme Court Rule 37A(III)(b)(8) states, in pertinent part, that
when Disciplinary Counsel "concludes that the development of
evidence establishes that there is no valid basis for proceeding to a
hearing, [she] shall submit a written report to the professional
conduct committee requesting that the matter be dismissed either

84

with a finding of no professional misconduct or on some other basis."

240. After reviewing this matter, undersigned counsel has concluded that it is unlikely the Professional Conduct Committee would make a finding by clear and convincing evidence that Mr. Griffith committed professional misconduct in this case. As such, undersigned counsel has concluded that there is no valid basis for proceeding to a hearing.

241. Accordingly, and for the reasons stated above, undersigned counsel requests that this matter be dismissed with a finding of no professional misconduct. However, undersigned counsel has concluded that a warning is appropriate. Language similar to the following is proposed:

> The Professional Conduct Committee finds that the Complainant's allegations could not be proven by clear and convincing evidence and the complaint is dismissed with a finding of no professional misconduct. The Committee finds, however, that the factual predicate for a number of Respondent's conclusory statements and arguments concerning (a) Complainant's mental health and actions towards his ex-wife, and (b) Complainant's 1999 financial earnings were inflammatory and without a strong factual basis. Further, the Committee is concerned about Respondent's judgment in responding to the demands and assertions of his client and otherwise generating unnecessary litigation. Accordingly, Respondent is warned under Rule 3.3(a) to take more care in the future to insure the accuracy and fairness of his pleadings and statements to the court.

85

242  Mr Ginsberg and Mr Griffith disagree with undersigned counsel's
analysis and conclusion.  Both have been advised that they may
file a response

WHEREFORE, undersigned counsel requests that the Professional
Conduct Committee:

A   Dismiss this matter with a finding of no professional misconduct;

B   Accompany the dismissal with a warning as follows:

> The Professional Conduct Committee finds that
> the Complainant's allegations could not be
> proven by clear and convincing evidence and the
> complaint is dismissed with a finding of no
> professional misconduct  The Committee finds,
> however, that the factual predicate for a number
> of Respondent's conclusory statements and
> arguments concerning (a) Complainant's mental
> health and actions towards his ex-wife, and (b)
> Complainant's 1999 financial earnings were
> inflammatory and without a strong factual basis
> Further, the Committee is concerned about
> Respondent's judgment in responding to the
> demands and assertions of his client and
> otherwise generating unnecessary litigation
> Accordingly, Respondent is warned under Rule
> 3.3(a) to take more care in the future to insure
> the accuracy and fairness of his pleadings and
> statements to the court

C   Grant such other relief as is fair and in the public interest

New Hampshire Supreme Court
Attorney Discipline Office
4 Park Street, Suite 304
Concord, New Hampshire  03301
(603) 224-5828

Dated:  June 9, 2006

Landya B  McCafferty
Disciplinary Counsel

86