# EXHIBIT H

# NEW HAMPSHIRE SUPREME COURT

## PROFESSIONAL CONDUCT COMMITTEE

Griffith, John P.

Advs.

Arthur Ginsberg

#02-131

## RESPONSE TO REQUEST FOR DISMISSAL WITH WARNING AND REQUEST FOR A HEARING

NOW COMES Arthur Ginsberg, pro se, and respectfully requests that the

Professional Conduct Committee deny Disciplinary Counsel's Request for a Dismissal

with Warning and instead schedule a hearing of the full Committee in the above

captioned matter.

In support, the undersigned states as follows:

1. I request that copies of this document be given to all of the members of the

Professional Disciplinary Committee. I would also like to be informed as to whether my

request is honored.

2. On June 9, 2004, Landya B. McCafferty, Disciplinary Counsel for the

Professional Conduct Committee, filed a Request for Dismissal With a Warning in this

matter.

3. Disciplinary Counsel's Request for Dismissal was based on her analysis of the

report of Assistant Disciplinary Counsel, Diane M. Nicolosi.

4.   The undersigned argues that the conclusions contained in the Request for

Dismissal With Warning: (1) apply the wrong burden of proof, (2) show evidence of bias

against finding fault with a member of the bar, (3) are unsupportable on their face, and

(4) are the result of factual errors or misrepresentations of the record.

5.   What follows is a summary of Mr. Ginsberg's argument and a request for

relief.

**I.  Disciplinary Counsel Applied The Wrong Burden Of Proof**

6.   Disciplinary Counsel applied the wrong burden of proof.  The clear and

convincing evidence standard is to be applied by the finder of fact, which is usually the

Committee, at the hearing stage.

7.   The correct standard of proof to be applied is the "preponderance of evidence

standard" when investigating allegations of attorney misconduct and determining whether

or not the attorney should be charged.

8.   The investigating attorney must utilize the same standard that a Grand Jury

applies when determining whether to bring an indictment.  That is to say, the

investigating attorney determines if the evidence presented shows whether it is more

likely than not that a violation of any Rule of the New Hampshire Rules of Professional

Conduct has occurred.

9.   Simply stated, the "preponderance of evidence standard" requires the

investigating attorney to assume the role of a cautious and disinterested person who

forms his or her belief based upon a "preponderance of the evidence" - evidence

persuading the investigator or a disinterested person more likely than not that the alleged

facts are true.

2

10. Disciplinary Counsel exceeds her investigatory authority by assuming a role as fact-finder and stating that the clear and convincing standard has not been met.

11. Plain and simple, Disciplinary Counsel has inappropriately acted as judge and jury.

## II. The Tone of Disciplinary Counsel's Request for Dismissal Shows Improper Bias

12. Disciplinary Counsel's choice of words shows bias against the undersigned and bias in favor of finding no professional misconduct.

13. For example, Mr. Ginsberg is characterized as "bitter" (R. at 6). He is described as "branding [his ex-wife] an adulterer," (R. at 7), when it was in fact the trial court that granted him a divorce on the grounds of her adultery.

14. Mr. Ginsberg's complaints to the Committee in this and other related matters are described throughout using words such as "accused" and "assailing" (R. at pg.10).

15. Mr. Ginsberg is described as "claim[ing]" that Mr. Griffith suborned perjury, and as "claim[ing] that Mr. Griffith misrepresented that he had a copy of the tape to bolster the false testimony." (R. at pg. 21).

16. Mr. Ginsberg's behavior is described as "antics" (R. at pg. 25) that interfered with Mr. Griffith's plans to go to the movies, at a time when Mr. Ginsberg was facing arrest and loss of his children. The word "antics" in this context trivializes Mr. Ginsberg, and shows bias against him.

17. Regarding the reliability of the evidence in the D.A.S. Business Plan, the Disciplinary Counsel shows bias in stating that "Mr. Ginsberg's contention appears suspect." (R. at pg.12). Again this is a question of fact that should go to the Committee to decide.

3

18. Disciplinary Counsel repeatedly uses the phrase "According to Mr. Ginsberg," rather than making a simple declarative statement. The use of the phrase "according to" implies that Mr. Ginsberg's statement are unsupported by the record, when Mr. Ginsberg was very careful in making his complaint to the Committee to only make allegations about Mr. Griffith's misconduct that could be directly supported by documentary evidence or transcriptions of sworn testimony.

19. Disciplinary Counsel states: "According to Mr. Ginsberg, he told the police officer that he did not want Ms. Wilson arrested and testified to that fact at her misdemeanor trial." (R. at pg. 38). The use of the words "according to" undercuts the fact that he did testify to that fact. In addition, independent corroboration was made at trial by Attorney Spaloss himself. Diane Nicolosi trivializes Mr. Griffith's accusations (paragraph 113, pg.38). In fact, Attorney Griffith, in a motion to the Court, claimed that Mr. Ginsberg made dishonest, criminal accusations against Ms. Wilson and "had her arrested."

20. On the other hand, the words used in describing Mr. Griffith show bias in the opposite direction. When Disciplinary Counsel states unequivocally that "Mr. Griffith's statements about the D.A.S. Business Plan are accurate," she clearly is showing bias in favor of Mr. Griffith. Moreover, she is inappropriately fact-finding, where there is sufficient contradictory evidence for there to be a question of fact.

21. However, Mr. Griffith is given the benefit of the doubt. Disciplinary Counsel reports (R. at pg. 29) that Mr. Griffith "cannot account for his whereabouts on Sunday night and early Monday morning, although Ms. Woodward believes a good portion of the morning was spent at the courthouse with Ms. Wilson." Mr. Griffith has nothing

4

concrete to report. Ms. Woodward offers her belief of where they were on Monday morning. Yet, available to Disciplinary Counsel were Attorney Gottesman's contemporaneous notes of the telephone calls and meetings between himself and Mr. Griffith. Disciplinary Counsel gives no credence to these notes. Disciplinary Counsel displays a bias toward dismissing Mr. Ginsberg's contentions, even when supported by sworn testimony, documentary evidence or other reliable evidence and shows a similar bias toward believing the slightest explanation to excuse Mr. Griffith's conduct.

## III. Disciplinary Counsel's Failure to Consider Evidence Submitted by Attorney Hantz

22. In June 2006, Disciplinary Counsel met with Attorney Barbara Ann Hantz. At that meeting, Attorney Hantz reported that during the trial and post-divorce proceedings, Mr. Griffith repeatedly engaged in behavior that in her opinion shows evidence of professional misconduct and pattern of abuse that ought to be tried before a hearing of the Committee. Attorney Hantz went out of her way to meet with Disciplinary Counsel because she felt that Attorney Diane Nicolosi ignored and misrepresented what she had to say in her interview.

23. In this meeting, Attorney Hantz made several statements that shed doubt on the conclusions drawn in the Request for Dismissal. It does not appear that Disciplinary Counsel considered Attorney Hantz's contribution in preparing Request for Dismissal, which seems to rely solely on the work product of Attorney Nicolosi. In fact, Attorney's Pillsbury, Earnshaw, and Hantz all disagree with Diane Nicolosi and what she reported.

24. A copy of a letter from Attorney Hantz to Mr. Ginsberg is provided as Exhibit A hereto.

5

## IV. Disciplinary Counsel's Conclusion of No Evidence of Professional Misconduct is Unsupportable on its Face Because it Finds Mr. Griffith's Conduct, inter alia, Harmful to the Children and Lacking Basic Decency

25. Disciplinary Counsel concedes that on at least one occasion Mr. Griffith's conduct was "harmful to the children." (R. at pg. 30). How is this not professional misconduct?

26. Communications between the parties did not break down on their own. When Mr. Griffith came on this case he informed Attorney Pillsbury that Mr. Ginsberg could not speak with Ms. Wilson and that all communication with his client had to go through his office. Until then, Mr. Ginsberg and Ms. Wilson had spoken almost every day. (Paragraph 11, at pg. 4)

27. The acrimony increased when Mr. Griffith came on this case. While a divorce is contentious, the tone of the pleadings before Mr. Griffith came on the case compared to the tone after he came on the case shows that Mr. Griffith's participation increased the venom between the couple. (Paragraph 22, at pg. 6).

28. Mr. Griffith interfered with attempts to mediate or come to some sort of resolution between the parties. The evidence in court, attorney correspondence, and Mr. Ginsberg's attorney's interviews with Diane Nicolosi shows that he tried at every opportunity to mediate this case but Mr. Griffith sabotaged all efforts. (paragraph 25, at pg. 7). As advocate, he of course had a duty to represent his client, but his aggression was in fact detrimental to his client and the children.

29. Mr. Griffith cannot be excused by arguing that his client signed affidavits to support his filings. In court, he clearly led his witness in hearsay testimony. The following is just one of many examples in the record and was quoted by Disciplinary Counsel in her Request for Dismissal:

6

Mr. Griffith: -- were you present at the hearing they had on the
   preliminary injunction?
Ms Wilson: Yes, I was.
Mr. Griffith: And did you hear Mr. Ginsberg testify?
Ms. Wilson: Yes, I did.
Mr. Griffith: And did he testify about gifting the stock to Mr. Kahan?
Ms. Wilson: Umm.
Mr. Grifiith: Let's strike that. Strike that. Did you hear him testify about
   an agreement he had made with Mr. Kahan on the eve of your divorce
   trial, about the stock?
Ms. Wilson: -- Yes
Mr. Griffith: And what was that?
Ms. Wilson: The agreement was, was that he was going to agree to a cut in
   pay, and to be a minority shareholder in both companies.
Mr. Griffith: And what was the quid-pro-quo? What was he getting for it?
Ms. Wilson: In return for David testifying against me.
Mr. Griffith: And also testifying against the value of the company?
Ms. Wilson: And also testifying as to the lack of value of the companies.

Following this colloquy, Ms. Hantz objected to the admissibility of Ms.
Wilson's testimony on the basis that it was hearsay, it was "not supported
by the record in that hearing," and she did not "have a transcript of that."
In response, Mr. Griffith stated: "—We have a – it's tape-recorded, and
we'll give the Court the date and the time that [simultaneous, inaudible]."
Ms. Hantz, apparently understanding Mr., Griffith to mean he had a copy
of the hearing tape, requested in writing that Mr. Griffith produce it. (R. at
pp. 20, 21).

30. The quoted excerpt illustrates several things. First, Mr. Griffith has a

propensity for submitting unreliable evidence to the trial court. He examined his client

on the stand about sworn testimony she heard in an unrelated court proceeding. This

evidence is hearsay. Further, a transcript of the sworn testimony could have been

produced, had Mr. Griffith chosen to do so, and offered into evidence. Instead Mr.

Griffith chose to rely on the memory of his client, who had a motive to lie.

31. Even then, he had to lead her ("Mr. Griffith: And also testifying against the

value of the company? Ms. Wilson: And also testifying as to the lack of value of the

companies.") (R. at pg. 21).

7

32. Attorney Hantz objected to the hearsay, stated that the testimony was "not supported by the record" and asked Mr. Griffith to produce a transcript of that hearing. Mr. Griffith made an ambiguous reply. Disciplinary Counsel chooses to interpret Mr. Griffith's reply merely giving Ms. Hantz the impression he had a transcript. The undersigned believes that the Court, and indeed everyone in the gallery that day, was under the same impression as Ms. Hantz.

33. Mr. Griffith cannot hide behind his client on this, claiming that even if her testimony was false, he could not have known that to be the case. First, Mr. Griffith was present himself for the events about which he questioned Ms. Wilson. Second, Mr. Griffith had to resort to leading his witness to elicit the response he desired.

34. Further, it does not matter what his client signed if Mr. Griffith knew it was not true. Mr. Griffith didn't even attempt to use the financial records for which he had a release. (paragraph 37, pg. 11). He cannot be permitted to rely on what his client told him and was willing to sign to. The standard is "known or should have known." There comes a point where a lawyer cannot claim that he was fooled by his client. Mr. Griffith reached and passed that point.

35. Mr. Ginsberg's assertion that Mr. Griffith suborned perjury should go to the Committee to consider. As Attorney Hantz stated to in her meeting with Disciplinary Counsel, Attorney Griffith and his client filed motions and made statements in court accusing Mr. Ginsberg of threatening his daughter with a knife. In this meeting Attorney Hantz told how at trial Mr. Griffith led Ms. Wilson through questions on the knife claim (paragraphs 186 -192). On cross examination by Attorney Hantz, Ms. Wilson admitted that there was never any knife but perused the claim anyway. After the hearing, Mr.

8

Griffith changed his tune and started using the term knife incident or Tupperware bowl incident, depending on the person's point of view. Contrary to Diane Nicolosi's claims this was not consistent with Mr. Griffith's pleadings and leading question of his client at hearing. Attorney Nicolosi refused to get the transcript of this hearing.

36. In addition to using unreliable evidence such as Ms. Wilson's hearsay rendition of sworn testimony that was available, Mr. Griffith repeatedly submitted unreliable evidence over and over again, even after it had been completely discredited or its reliability shown as in doubt.

37. The use of the D.A.S. Business Plan is a prime example of this tactic. Mr. Griffith submitted this as hard evidence of the value of the business and of certain assets, including the IPNI stock options.

38. Not only was the stock option information made available to Attorney Durkin, but other documents that were provided by IPNI were given to him. In April of 1999, IPNI went through a 3 to1 reverse stock split. As the record shows, Attorney Durkin was given a copy of the document from IPNI explaining the transaction. So, Mr. Griffith had three confirming sources that the IPNI stock was not worth anything but filed accusations of fraud anyway.

39. The record clearly shows that the reliability of the business plan as evidence was challenged. In addition, the record clearly shows that Mr. Griffith had in his possession much more reliable evidence, i.e., the actual business records. Yet, the record clearly shows that Mr. Griffith continued to quote from the draft business plan.

40. While it is true that an attorney may wish to use evidence more favorable to his client's position, that does not mean that an attorney may continue to use discredited

9

evidence and cause his opponent to have to defend and relitigate the same point over and over again.

41. There are two divergent views of the significance of the D.A.S. Business Plan, its reliability as evidence and its use, or misuse, by Mr. Griffith. The Committee should be given an opportunity to determine the truth of this at a hearing.

42. Supervising attorneys are responsible for the actions of attorneys and paralegals under their supervision. Disciplinary Counsel is wrong when she asserts (at pg. 48) that "even assuming arguendo it is provable by clear and convincing evidence that Ms. Woodward's affidavit was false, there is no evidence, other than the fact that Ms. Woodward is married to and serves as the paralegal for Mr. Griffith, that Mr. Griffith had knowledge of or should have known of the falsity of Ms. Woodward's statement."

43. To the contrary, the record is full of evidence of the close working relationship between Ms. Woodward and Mr. Griffith. In fact, many of Mr. Ginsberg's complaints of Mr. Griffith's conduct also involve the involvement of Ms. Woodward. For example, Ms. Woodward was a participant in depositions where her conduct and decorum was questionable.

44. Ms. Woodward gained entrance to a deponent's (Ms. Nazarenko) home, by what can charitably be called misdirection; she arrived at the home with Ms. Wilson, who introduced her simply as "Barbara." Ms. Nazarenko admitted them, and then found herself being confronted about her testimony in the upcoming deposition. Mr. Griffith was waiting out in the car and then came in to the house to confront Ms. Nazarenko, who was too intimidated to tell them to leave.

10

45. Ms. Woodward also interfered with Ms. Nazarenko's deposition by rolling her eyes and distracting Ms. Nazarenko. (paragraph 151, at pg 50). Disciplinary Counsel states that the behavior described is "unprofessional and certainly impolite, it is not directly attributable to Mr. Griffith." Ms. Woodward was sitting right next to him. Supervising attorneys are responsible for the professional misconduct of those they supervise.

46. Ms. Woodward was a key player in the drama surrounding the delay in accepting the outstanding alimony payments at the time when Mr. Ginsberg had an arrest warrant hanging over his head and the fear that if he were taken into custody, his children would be placed in foster care. Ms. Woodward was in court, at school meetings, at depositions. For Mr. Griffith and Disciplinary Counsel to argue that Mr. Griffith did not "know or should have known" of his wife/paralegal's false affidavit is a question of fact that should have gone to the Committee in a hearing.

## V. The Request For Dismissal Contains Factual Errors Or Deliberate Misrepresentations Of The Record

47. The Request for Dismissal is full of factual errors, misreadings or, possibly, deliberate misrepresentations of the record, apparently in the cause of finding no professional misconduct. There are myriad examples. Below is a discussion of only a few of the more egregious examples.

48. In Paragraph 7 (at pg. 3) Disciplinary Counsel notes that Mr. Ginsberg and Mr. Kahan bought out their partner, Mr. Trustman. Counsel omits that Mr. Trustman's share of the company was purchased for $20,000, which is an indication that the value of

11

the company was nowhere near the amount suggested in pleadings submitted by Mr. Griffith.

49. Disciplinary Counsel's description of the circumstances surrounding Attorney Griffith's and Attorney Spaloss's appearances in this case is woefully inadequate and misleading. Indeed, even Judge Hampsey, when he first denied Attorney Spaloss's appearance, stated that he suspected the motive behind Mr. Spaloss's appearance. Attorney Luci Pillsbury was interviewed by Disciplinary Counsel Nicolosi and told Diane Nicolosi that she found the whole Spaloss and Judge Hampsey issue particularly unethical. Luci Pillsbury told Diane Nicolosi that Mr. Spaloss was brought in for the sole purpose of getting Judge Hampsey to recuse himself and did practically nothing. Attorney Pillsbury's experience with the court, Mr. Griffith, and Mr. Spaloss supports Mr. Ginsberg, and Disciplinary Counsel ignored it completely. Mr. Spaloss lied to the Committee about the use of hours he devoted to this case, which is confirmed by Attorney Pillsbury. Attorney Pillsbury has been informed of the report and states that nothing of what she discussed with Attorney Nicolosi was included in the report. Attorney Pillsbury told Attorney Nicolosi that she saw the Spaloss appearance as judge-shopping. Attorney Pillsbury feels that Mr. Griffith's charges of fraud against Mr. Ginsberg are grounds for action by the Committee. (Paragraph 11, at p. 4, paragraph 30 ff, at p. 9).

50. The description of the events surrounding Mr. Griffith's motions for extension of time for discovery and for recusal is incorrect and misleading. Mr. Griffith appeared in June 1999. Discovery was closed in May. Mr. Griffith started making false accusations of fraud in order to have discovery reopened two months later. Luci Pillsbury

12

told Diane Nicolosi that Griffith lied to the court without concern just to get discovery reopened. He refused to disclose where he was getting his bogus information. The transcript of the July 28, 1999 hearing is filled with Mr. Griffith testifying for his client and lying. (Paragraph 14, at pg. 4).

51. The evidence, by way of company financials, were available to Mr. Griffith to show that his claims of "fraud and diversion of assets" were not true. (paragraph 36, pg. 11). Any accountant or lawyer knows that you have to look at the financials of a company and then make a challenge, if any. Mr. Griffith lied to the court about not getting a release to look at company financial records; the release was given months before he filed his appearance. Attorney Durkin, Ms. Wilson's former attorney and Mr. Griffith just never acted on it. Mr. Griffith then made criminal allegations of fraud against Mr. Ginsberg in court in a desperate, and ultimately successful, attempt to have discovery reopened. He refused Attorney Pillsbury's demand that he give proof of his claim of fraud.

52. Disciplinary Counsel implies that Mr. Ginsberg attempted to slander Ms. Wilson regarding her alcohol abuse. (Paragraph 23, at 7). That implication is misleading and discredits Mr. Ginsberg. Ms. Wilson's alcohol abuse was a key factor in the breakdown of the marriage. Ms. Wilson told the GAL that she abused alcohol; it's in the GAL report. The record is full of descriptions of instances where Ms. Wilson was intoxicated and had the children in her care. The Court's Final Decree imposed a condition on Ms. Wilson that she not drink when she had visitation of the children. Ms. Wilson repeatedly disobeyed that court order. Although the court did not punish her, it did find her in contempt for consuming alcohol while having visitation and telling the

13

children to not speak with GAL Kate Earnshaw; that she was a bad person and had hurt many children.

53. Disciplinary Counsel also implies Mr. Ginsberg had no basis for his complaining that Ms. Wilson repeatedly broke into his home. (Paragraph 23, at pg. 7). Ms. Wilson was seen by neighbors entering his house on four occasions when he was not home. The court found that Ms. Wilson was ignoring the court order that stated that each must respect the each other's residence as their own. She was ordered to stay out of Mr. Ginsberg's house.

54. Ms. Wilson was arrested at the former marital home in September 1999 after Mr. Ginsberg called the police to have her removed from the property and informed them that Ms. Wilson was violating an order of the court. prohibiting her from entering the residence. She was ultimately charged with simple assault for allegedly scratching Mr. Ginsberg on the left elbow. (R. at p. 37).

55. Disciplinary Counsel reports that Mr. Ginsberg "claims" that his call to the police was only to have Ms. Wilson removed from the marital property because, "in his view," her conduct was in contempt of the court order giving him exclusive use and possession of the marital property. This implies that Mr. Ginsberg's "view" is unreasonable. There was a court order giving him exclusive use and possession of the former marital home, and ordering each to respect the other's residence. Disciplinary Counsel quotes a letter from Attorney Spaloss to Nashua Police Don Connelly, dated November 9, 1999, in which he reports that "[t]here is no restraining order, neither in District Court or Superior Court" as somehow dispositive. It should not be necessary to impose a restraining order to keep a person out of one's property

14

56. Disciplinary Counsel states, but does not appear to give much weight to the fact that "Mr. Ginsberg stated [to the police officer] that there is a previous contempt of court because she entered on other occasions." (paragraph 116, at pg. 39). This statement was accurate.

57. There was nothing improper or vindictive when Mr. Ginsberg called the police to ask assistance in removing Ms. Wilson from his home.

58. Further, Disciplinary Counsel bias is shown when she states that the "bottom line is that it is Mr. Ginsberg's actions that resulted in Ms. Wilson's arrest." (paragraph 117, at pg. 39). On the contrary, it was Ms. Wilson's actions that lead to her arrest. She is the one trespassed, refused to leave, scratched Mr. Ginsberg on the arm and threatened to drive her car through the garage and made other threats of violence.

59. Disciplinary Counsel shows bias when stating, "Further, Mr. Spaloss was able to attest to the fact that, in December of 1999, while he was attempting to negotiate a non-trial disposition of the criminal matter with the police officer, he learned that Mr. Ginsberg was "adamant" that she be prosecuted (paragraph 115 at pg. 38). There is no foundation for this claim and Mr. Ginsberg doesn't know of any negotiations, as he was never contacted. Mr. Ginsberg was called to testify at the trial and told the court that he didn't want his ex-wife arrested.

60. Again Disciplinary Counsel either misrepresents or misstates when she suggests that Mr. Ginsberg had a vindictive motive for filing a motion accusing Ms. Wilson of offering to trade custody of the children for money. (paragraph 24, at pg. 7). GAL Attorney Earnshaw testified that Ms. Wilson said that Mr. Ginsberg could have the

15

children in exchange for her desired financial settlement. Ms. Wilson even told Attorney
Earnshaw that she didn't want visitation during weekdays.

61. Disciplinary counsel's assertion that "sufficient factual support existed for Mr.
Griffith's statement and argument about the products." (paragraph 38, at pg. 12). Draft
business plans are not a substitution for the company financial records. It was old and out
of date when Mr. Griffith got it. However, the general ledger of the company was up to
date, but he didn't look at it because it didn't support his claim of fraud. The brochures
Mr. Griffith produced to Attorney Nicolosi in April of 2006 were for products that were
obsolete before Mr. Griffith came on the case. (paragraph 38, at pg. 12). The company
financial records proved that. It's like giving you a brochure for Enron: just because a
brochure exists does not mean that the product, or even the company, continues to exist.

62. Mr. Ginsberg doesn't know about any inheritance Ms. Wilson received in
1986 and finds it suspect that Mr. Griffith produced a fax affidavit dated 1999, in April
2006. If true, then why wasn't this part of testimony or motions during the divorce case?

63. A copy of the draft business plan can be printed up anytime and made to look
as pretty as you want. Since the date on the draft that Mr. Griffith had in July of 1999 was
over a year old, it still could not be relied on.

64. Diane Nicolosi has misrepresented the facts of this case involving the draft
business plan. In paragraph 40 she references a letter Mr. Ginsberg wrote firing a
consultant (Atlantic Management) before finishing a project. Atlantic Management had
nothing to do with the draft business plan. Mr. Griffith knew the draft business plan was
bogus and that Mr. Ginsberg and his business partner never approved the business plan or
its use. The draft business plan was written by Peter Beck. Any rational person could see

16

that this was a draft business plan by its content. Peter Beck listed himself as Senior VP of Business and Market Development. Mr. Beck was never an employee Mr. Ginsberg's company and was never on the payroll. It became obvious that Mr. Beck's ideas for the future were beyond the capabilities of Mr. Ginsberg's company. Mr. Ginsberg and his partner and didn't see eye to eye on many issues with Mr. Beck and they parted ways and the draft plan was scraped. Why didn't Mr. Griffith ask any questions about the new products Mr. Beck said we were developing? Mr. Griffith didn't even ask why Mr. Beck was listed as Senior VP of Business and Market Development, but was not with the company. Why did Mr. Griffith hide this draft business plan from my attorney and the court? Mr. Griffith knew the draft business plan was bogus and that my partner and I never approved the business plan or its use.

65. The factual information on the company was available to Mr. Griffith in the company financial records. (paragraphs 39-46, pp. 12 ff).

66. Regarding the children's education funds, Disciplinary Counsel has misrepresented the facts. (paragraphs 47-49, pp. 15-16). Ms. Wilson told the children and Mr. Ginsberg that their educational money was in bank accounts for each of them. The joint investment funds were the couple's marital investments. Ms. Wilson even listed these accounts as joint marital accounts in 1997, and again in 1998. When Mr. Ginsberg found out that Ms. Wilson took the children's education funds he opened new accounts for the children. Ms. Wilson accompanied him to the bank when he opened these accounts. Later, when Mr. Griffith came on the case, he filed a Motion for Contempt, for opening these accounts, claiming that Mr. Ginsberg was hiding money from Ms. Wilson. Then Mr. Griffith filed a new accounting of the marital investments that contradicted the

17

previous two; accounts that had been previously identified as joint marital were now

characterized as the children's educational accounts. Whatever, Ms Wilson testified to at

the hearing was contradictory to the evidence she provided before Mr. Griffith came on

the case. Despite Disciplinary Counsel's assertion to the contrary (at p. 16), the

inconsistencies are significant. To further show the inconsistencies and lying Mr. Griffith

used to get Discovery re-opened, the following took place in the hearing of July, 28 1999.

```
Mr. Griffith:   Now, at the latter -- last few years, the
                respondent has been involved in developing a
                business with a partner--actually there are
                two businesses, it's the video conferencing
                business--and they have developed soft ware
                to assist in video conferencing. And the
                petitioner has had gifts from her
                grandparents -- grandfather--about
                $60,000 a year for the last three or four
                years --which has gone into this to help
                build this up so that he can concentrate on
                building up this business. So the issue now
                is --
THE COURT:      She, the petitioner, had gifts of $60,000 a
                year?
Mr. GRIFFITH:   A year for the last three or four years.
THE COURT:      Or the petitioner and the respondent had
                gifts --
Mr. GRIFFITH:   It was 20,000 to respondent, 20,000 to
                petitioner, 10,000 to each child; all of
                which went into this business.
```

Ms. Wilson later testified that she didn't have any proof that any money was invested in
my company.

   67. Disciplinary Counsel's version of how Mr. Griffith almost contrived to have

Mr. Ginsberg arrested following the Christmas Eve 2001 motion of contempt for

nonpayment of alimony is wrong. (paragraphs 67ff, pp. 23ff). This was one of the most

contemptible ploys Mr. Griffith used throughout the whole sorry proceedings. At the

time Mr. Ginsberg was in a dispute with his business partner which locked him out of his

company, he was not surprisingly unable to pay alimony. Mr. Griffith filed for contempt

18

asking that Mr. Ginsberg be arrested if unable to pay. While it is true that from one point of view, Mr. Griffith was advocating for his client, it is also true that Mr. Ginsberg did not have the money; the only way he was able to deliver was to go hat in hand to his friends. Mr. Griffith missed no opportunity to humiliate Mr. Ginsberg. This was a well planned out attempt by

68. Disciplinary Counsel is wrong when she states that the mittimus was issued on Friday, January 4, 2002. (paragraph 69, at pg. 24). In fact, the mittimus was not issued until some time Monday afternoon, January 7, 2002, after Mr. Ginsberg had delivered the back alimony. So, when Disciplinary Counsel states (p. 25) that "Mr. Griffith's motive to lie to Mr. Gottesman about his plans is not readily apparent," she ignores that the mittimus had not yet been issued.

69. Mr. Ginsberg borrowed the money from friends and alerted his attorney, David Gottesman, of that fact. This was on Saturday, not Sunday, as the report states. Then followed the attempts by Attorney Gottesman to deliver the funds, and the stalling tactics by Mr. Griffith. The reason Mr. Griffith stalled was because the mittimus was not yet issued. Mr. Griffith and Ms. Wilson wanted Mr. Ginsberg arrested so that they could file an emergency ex parte motion for change of custody. That is why Ms. Wilson and her mother were waiting in the courthouse since 9:00 that morning. Disciplinary Counsel characterizes Mr. Griffith's behavior during this period as perfectly reasonable care for the financial well-being of his client. He could have had the funds in hand over the weekend, but delayed as long as possible in the hope that Mr. Ginsberg would be arrested, which is supported by Attorney Gottesman.

19

70. As the deposition of John Hamilton shows, when Attorney Griffith told Attorney Gottesman that he was going to be at the movies, Mr. Griffith was actually at Kinko's in Nashua on Sunday evening, where he met with Ms. Wilson and Mr. Hamilton. In section 16 of my original complaint and in transcripts supplied, John Hamilton spoke of a plot (See second deposition of John Hamilton (pg. 10, line 21); (pg.17, lines 13-18); (pg. 37 line 20 through pg. 38); (pg. 41, line 23 through pg. 42).

71. The Request for Dismissal also states that Mr. Griffith "promised to inform the court that the arrearage was paid" (paragraph 86, at pg. 29). In fact, Attorney Gottesman was so suspicious that he went to the courthouse himself to file a notification that the arrearage was paid.

72. It should also be noted that Attorney Gottesman reviewed and edited the portion of Mr. Ginsberg's complaint to the Committee that related to these events in order to insure its accuracy.

73. Attorney Gottesman took copious contemporaneous notes to preserve the record, since these events were so extreme. These notes were made available to Attorney Nicolosi during her investigation. It seems that Attorney Gottesman was convinced by at least a standard of clear and convincing evidence, that Mr. Griffith was doing everything possible to prevent Mr. Ginsberg from timely paying the arrearage. The Committee should be given an opportunity to review the evidence and come to the same conclusion.

74. In the spring of 2003, Mr. Ginsberg was forced to consider bankruptcy. Attorney Hantz informed Mr. Griffith that Mr. Ginsberg had retained Attorney Askenizer, and requested a meeting. Mr. Ginsberg owed no money to credit card companies. His other creditors were his daughter's private school, and the friends who

had lent him funds so that he would not be arrested over New Year's 2002. His business property settlement debt to Ms. Wilson made her by far the major creditor. The purpose of the meeting was to arrange for a period of forbearance so that Mr. Ginsberg could get his finances in order and possibly avoid bankruptcy. The meeting was held, and although no terms were agreed upon, Mr. Ginsberg did agree to hold off on filing his bankruptcy petition until he received a counter-proposal from Mr. Griffith (paragraph 134, at page. 44). Disciplinary Counsel states that Mr. Ginsberg "delayed" filing in exchange for Mr. Griffith's promise to provide a counter-proposal. Attorney Hantz and Attorney Askenizer can corroborate that this was the agreement. There was no further communication from Mr. Griffith until June 2, 2003, when he filed a motion for contempt on Ms. Wilson's behalf. Disciplinary Counsel fails to report that Mr. Griffith also attempted to place a lien on Mr. Ginsberg's house, which was not only his home, but his children's only home. A motion for contempt and an attempt at attachment are not what one usually expects as a counter-proposal in a negotiation. Mr. Griffith did not deal in good faith with Mr. Ginsberg, or his attorneys, in this matter. Again, the Committee should be given the opportunity to review this conduct and judge for itself.

75. The final example to be discussed is the supposed cash investment by Ms. Wilson in the companies started by Mr. Ginsberg and Mr. Kahan. That this is the last example presented should by no means be taken by the Committee to mean that there are not many many more examples that could be discussed. The Disciplinary Counsel's Request for Dismissal is full of factual errors and misinterpretations.

76. Ms. Wilson claimed that she made a cash investment to seed the startup of Empire Multimedia. This claim was hotly disputed in the divorce proceedings, and a

21

quick perusal of the company financials would show that this was a service company and there wasn't seed money. Mr. Ginsberg and Mr. Kahan continued to work full-time day jobs and worked on the company at night, after the children were asleep. Ms. Wilson did not invest any money in the companies. However, over the years of the divorce case, and even in a filing in the bankruptcy proceeding, Mr. Griffith continued to advance this claim, obliging Mr. Ginsberg to once again dispute the already discredited claim. Disciplinary Counsel attempts to dismiss Mr. Griffith from any liability in this matter because Ms. Wilson signed supporting affidavits to his pleadings. However, the record shows Mr. Griffith to be an active proponent of this bogus claim. He has to lead his own witness to get her to answer as he desires. (paragraph 164ff at pp. 54ff). Mr. Griffith looked at the company books and Ms. Wilson testified on the witness stand that she had no proof at all that she invested any money at all.

77. The Committee should be given an opportunity to weigh the evidence and judge whether Mr. Griffith violated the rules of professional conduct. This matter should go forward to a hearing.

## VI. Request For Relief.

78. Disciplinary Counsel relies on Supreme Court Rule 37A(III)(b)(8) in her assertion that this matter should be dismissed without a hearing. Disciplinary Counsel states that she has concluded, in accordance with the Rule, that "the development of the evidence establishes that there is no valid basis for proceeding to a hearing" and that she has "submit[ted] a report to the professional conduct committee requesting that the matter be dismissed either with a finding of no professional misconduct or on some other basis." As discussed above, Disciplinary Counsel has not applied the proper standard of proof to the evidence that was developed.

22

79. Further, the word choice used in the discussion of much of the evidence, and the selective use of the evidence to cast in a light favorable to Mr. Griffith, shows bias toward dismissal of Mr. Ginsberg's complaint.

80. Additionally, the Request for Dismissal cannot be supported when it states that Mr. Griffith's conduct was "emotionally harmful to the children," (R. at pg. 30), and showed a "lack of civility and basic decency." (R. at pg. 76). How can evidence that Mr. Griffith's conduct was emotionally harmful to children, was uncivil and devoid of basic decency be anything other than professional misconduct? The Committee should be given an opportunity to hear this matter and decide these questions for itself. Accordingly, the undersigned respectfully requests that this matter be scheduled for a hearing and that Disciplinary Counsel's Request for a Dismissal with Warning be denied.

WHEREFORE, the undersigned requests that the Professional Conduct Committee:

A. Deny the Request for a Dismissal with Warning;

B. Schedule this matter for a hearing before the Professional Conduct Committee;

C. Grant such other relief as is fair and in the public interest.

Dated: June ___, 2006

Arthur Ginsberg

23