# EXHIBIT L

# SUPREME COURT OF THE STATE OF NEW HAMPSHIRE

JOHN P. GRIFFITH, Esq.,

advs.

#02-131

ARTHUR GINSBERG

## Rule 11 Petition for Original Jurisdiction

Now comes Arthur Ginsberg, *pro se*, and petitions requesting this Court to exercise original jurisdiction under Supreme Court Rule 11. Petitioner believes that there are special and important reasons for this Court to exercise its discretion and assume original jurisdiction in this matter. In compliance with rule 26, I state that this pleading was prepared with the assistance of New Hampshire attorneys. Petitioner believes that the Disciplinary Counsel of the Professional Conduct Committee of the Supreme Court of the State of New Hampshire (hereinafter "Disciplinary Counsel" and "Committee") and the Committee itself have so far departed from the accepted or usual course of administrative agency proceedings as to call for an exercise of this Court's power of supervision.

### Rule 11(2)(a).      The decision to be reviewed.

Pursuant to the requirements of Rule 11(2)(a), a copy of the Committee's decision, dated July 19, 2006, dismissing Petitioner's complaint against Mr. Griffith is attached as an exhibit hereto, in the Appendix at Tab 1.

**Rule 11(2)(b).     The questions presented for review.**

Whether, in requesting a dismissal of the charges filed against Attorney John Griffith with a warning, the Disciplinary Counsel of the Professional Conduct Committee of the Supreme Court of the State of New Hampshire improperly evaluated the evidence rather than developing it to determine whether there is a valid basis for proceeding to a hearing, incorrectly applying a standard of "clear and convincing evidence" burden of proof rather than the "preponderance of the evidence" burden of proof to the investigatory stage of the proceedings, and in doing so it has so far departed from the accepted or usual course of judicial or administrative agency proceedings as to call for an exercise of this Court's power of supervision.

Whether the original complaint submitted by Petitioner to the Committee (attached as an exhibit hereto, in the Appendix at Tab 7), in itself met the proper burden of proof because citations to the record were supplied for each allegation made, and failure of the Committee to consider this showed improper bias in Mr. Griffith's favor, and in doing so it has so far departed from the accepted or usual course of judicial or administrative agency proceedings as to call for an exercise of this Court's power of supervision.

Whether the Committee's failure to comply with its own decisions (see correspondence attached as an exhibit hereto, in the Appendix at Tab 6) that (i) its investigator, Attorney Dewhurst, had determined that a hearing was necessary in this matter and (ii) the Committee had a conflict of interest with Mr. Griffith that would warrant appointment of a special hearing panel, showed improper bias in favor of Mr. Griffith, and in doing so it has so far departed from the accepted or usual course of

2

judicial or administrative agency proceedings as to call for an exercise of this Court's power of supervision.

Whether the Committee's failure to give any weight to evidence misrepresented and ignored by Diane Nicolosi, Special Disciplinary Counsel, obtained from Attorney Hantz, Attorney Pillsbury and GAL Attorney Earnshaw, and the Committee's failure to give any weight to evidence developed in a meeting held at the Committee's office attended by Disciplinary Counsel, Assistant Disciplinary Counsel, Petitioner and Attorney Hantz, Petitioner's divorce attorney, shows improper bias, and in doing so it has so far departed from the accepted or usual course of judicial or administrative agency proceedings as to call for an exercise of this Court's power of supervision.

Whether the Committee's conclusion of no evidence of professional misconduct is unsupportable on its face because its Disciplinary Counsel found Mr. Griffith's conduct, *inter alia*, harmful to the children and lacking basic decency, and in doing so it has so far departed from the accepted or usual course of judicial or administrative agency proceedings as to call for an exercise of this Court's power of supervision.

Whether the Committee's based its decision on the Disciplinary Counsel's Request for Dismissal which contained factual errors or deliberate misrepresentations of the record, and in doing so it has so far departed from the accepted or usual course of judicial or administrative agency proceedings as to call for an exercise of this Court's power of supervision.

Whether Mr. Griffith's conduct after receiving a copy of the Disciplinary Counsel Request for Dismissal with Warning, in that he attempted to mislead the Committee by taking things out of context (see correspondence attached as an exhibit hereto, in the

3

Appendix at Tab 2), itself demonstrated to a preponderance of the evidence standard, that
Mr. Griffith indeed engages in a pattern of abuse of the system and failure of the
Committee to consider this showed bias in his favor, and in doing so has it so far departed
from the accepted or usual course of judicial or administrative agency proceedings as to
call for an exercise of this Court's power of supervision.

Whether Mr. Griffith's conduct in other matters, such as lying in his own divorce
case, which led to his arrest for non-payment of alimony (see Appendix at Tab 9), and
lying to the New Hampshire Supreme Court on an appeal in that case, evidence of which
was supplied to Disciplinary Counsel, in itself demonstrated to a preponderance of the
evidence standard, that Mr. Griffith indeed engages in a pattern of abuse of the system
and failure of the Committee to consider this showed bias in his favor, and in doing so it
has so far departed from the accepted or usual course of judicial or administrative agency
proceedings as to call for an exercise of this Court's power of supervision.

### Rule 11(2)(c). Provisions of constitutions, statutes, ordinances, rules or regulations

Pursuant to the requirements Rule 11(2)(c), the text of Supreme Court Rules 37
and 37A are attached as exhibits hereto, in the Appendix at Tab 12 and Tab 13. This
petition relies particularly on Rule 37A(III)(b)(8), which states, in its entirety:

> **(III) *Formal Proceedings***
> ...
>
> **(b) *Institution of Proceedings.***
> ...
>
> **(8) *Further Review.***
> **If at any point prior to the hearing on the merits, disciplinary
> counsel concludes that the development of evidence establishes that
> there is no valid basis for proceeding to a hearing, he or she shall
> submit a written report to the professional conduct committee
> requesting that the matter be dismissed either with a finding of no
> professional misconduct or on some other basis.**

4

**Rule 11(d)(2).     Other documents involved.**

Pursuant to the requirements of Rule 11(2)(d), the provisions of other documents involved in the case, namely:

- correspondence between the Petitioner and the Committee,

- between Mr. Griffith and the Committee,

- a letter from Attorney Hantz addressed to Petitioner,

- court records from Griffith v. Malouf.

- selected pleadings from Griffith v. Griffith

- a letter from Attorney Durkin to CPA Albright,

are attached as a exhibits hereto, in the Appendix at Tabs 2, 3, 6, 8, 10 and 11.

**Rule 11(2)(e).     A concise statement of the case.**

Pursuant to the requirements of Rule 11(2)(e), the following is a concise statement of the case containing the facts material to the consideration of the questions presented, with appropriate references to the appendix, if any.

Mr. Griffith clearly committed professional misconduct. Petitioner's original complaint to the Committee supported each of his allegations against Mr. Griffith with citations to the record. The Committee made an original determination that a hearing was necessary, special disciplinary counsel should be appointed, and that, due to a conflict of interest between Mr. Griffith and the Committee, a special panel should be appointed by the Supreme Court to here the matter.

Instead, the Committee took advantage of the change in procedural rules that came into effect at the end of 2003, and assigned a new investigator, re-examined the

5

evidence (at that point supplemented by additional substantiated evidence against Mr. Griffith) and concluded that no hearing was necessary because the Petitioner had not met the burden of proof of "clear and convincing evidence." The Committee should have applied "preponderance of the evidence" as the standard. Its investigator, Attorney Dewhurst had already determined that a hearing was necessary. The Committee did not apply to this Court for special hearing panel due to the conflict of interest it acknowledged existed between Mr. Griffith and the Committee, creating bias in Mr. Griffith's favor. From where Petitioner and his divorce attorneys stand, it sure looks like the Committee went out of its way to avoid a hearing of the complaint against its good friend. Petitioner did not get a fair hearing from the Committee.

Petitioner's divorce proceedings began in June 1998, when his wife, Jennifer Wilson, abruptly announced that she was sick of the house, the kids and Petitioner, wanted a trial separation, and moved out of the marital home in less than a month, leaving him with full responsibility for the children. What Petitioner did not know at that time was that this was not a trial separation; his wife was actually having a trial relationship with another man. Petitioner was granted the divorce on the grounds of adultery, raised in his cross petition, and awarded physical custody of the children. Petitioner's former wife was allowed visitation with the children, subject to restrictions on her behavior; i.e., she was not allowed to drink alcohol when she had the children, and she was forbidden from bringing the children to any meetings of a cult in which she was involved.

In mid-June 1999, on the eve of trial in the divorce proceedings, Ms. Wilson fired Attorney John Durkin and hired new counsel, Attorney John Griffith. At that time,

6

discovery was closed, pre-trial hearings had been held, and the Guardian ad Litem's report was complete. Judge Hampsey had ruled at the Temporary Hearing. Temporary alimony was in place and Petitioner had physical custody of his two children, Elizabeth and Alyssa, who were at that time ages 11 and 8, respectively, and trial was scheduled to go forward. The Guardian ad Litem, Attorney Earnshaw, who was requested by Petitioner's ex-wife, had determined that the children were better off remaining in their father's custody. The ruling by Judge Hampsey in the temporary hearing was not favorable to Petitioner's ex-wife. And, Ms. Wilson had told the Guardian ad Litem that she did not even want custody of the children and that Petitioner could have them in exchange for her desired financial settlement, which the GAL testified to. Petitioner's ex-wife would later, on three different occasions, file for a change in custody. She wanted $7,000 a month in child support plus her $3,500 a month alimony, plus property settlement. After the last time the court denied her motion, basically finding her derelict as a mother, Ms. Wilson moved to Vermont and no longer sees much of the children.

Enter John Griffith, who first arranged to have Judge Hampsey recuse himself by bringing on as "co-counsel" Judge Hampsey's good friend, Attorney Henry Spaloss to have a new judge assigned, Judge Holman. Then Mr. Griffith basically started the case from scratch. He got discovery re-opened, forcing Petitioner to re-litigate issues that had already been settled. Attorney Griffith also made outrageous and baseless claims against Petitioner and the Guardian ad Litem (that were not made before), which he never substantiated, and moved to have the GAL replaced. Attorneys Griffith's abuse of the system lead to serious violations of Petitioner's civil rights, the legal process and turned a simple case into a six-year ordeal that cost Petitioner nearly $500,000 in legal fees, drove

7

him into bankruptcy, lost him his business, and, because Attorney Griffith dragged Petitioner's children into this case, seriously injured the children's mental health. It was obvious that with the help of Attorney Spaloss, Attorney Griffith went judge shopping.

That was only the beginning. Throughout the proceedings, Mr. Griffith made unsupported accusations of fraud and criminal activity against the Petitioner, used previously discredited evidence again and again, filed frivolous and harassing motions for changes in custody or for contempt of court, and generally continually threw mud at Petitioner, who was then forced to defend himself, over and over again, against the same, false charges.

In December 2002, Petitioner filed a complaint with the Committee. His divorce trial was still being litigated. After Petitioner's Professional Conduct Committee complaint was filed, the hostility of Mr. Griffith's pleadings on behalf of his client in the matter increased. From the beginning, Petitioner's lawyers said that for some reason this case was personal for Mr. Griffith.

An investigator was assigned and a decision that a hearing was necessary was sent to Petitioner and Mr. Griffith on December 19, 2003. In January 2003, the Committee wrote to Petitioner that it agreed there was a conflict of interest with Mr. Griffith and committing to asking the Supreme Court to assign special disciplinary counsel and a special hearing panel. Around that time, the revised Rules 37 and 37A came into effect and the structure of the Committee was changed. Landya McCafferty was appointed Disciplinary Counsel, and she wrote to the Petitioner in March 2004 that his case was assigned to her for review.

8

**Rule 11(2)(f).     The stage of the proceedings.**

Pursuant to the requirements of Rule 11(2)(f), the following is a concise statement specifying the stage of the proceedings at the Professional Conduct Committee of the Supreme Court, at which the questions sought to be reviewed were raised, the manner in which they were raised, and the way in which they were passed upon by the Committee:

On December 19, 2002, Petitioner filed a complaint with the Committee (attached as an exhibit hereto, in the Appendix at Tab 7). It should be noted that this complaint was filed while Petitioner's divorce case and the subsequent bankruptcy were still proceeding and Petitioner supplemented with additional evidence as Mr. Griffith committed additional acts of professional misconduct.

On December 19, 2003, the Committee sent Petitioner and Mr. Griffith a letter (attached as an exhibit hereto, in the Appendix at Tab 6) informing them that "the Committee has determined that a hearing will be necessary in the above matter, with respect to the allegations against Mr. Griffith."

On January 24, 2003, the Committee responded (attached as an exhibit hereto, in the Appendix at Tab 6) to a letter from Petitioner, dated January 5, 2003, in which Petitioner raised a question of a conflict of interest between the Committee and Mr. Griffith. The Committee acknowledged that such a conflict existed and detailed the procedures it would undertake to avoid the conflict. Among those actions were undertakings that "following the exchange of letters between you [Petitioner] and the respondents [Mr. Griffith], the Committee will ask the New Hampshire Supreme Court to appoint a substitute member of the Committee (Attorney Dewhurst) for the purpose of investigating your complaint" and "if it is determined that a hearing is necessary, the

9

Committee will ask the New Hampshire Supreme Court to appoint a substitute panel to
hear the case." Petitioner never got his hearing.

Rather, with complete disregard for its decision of January 5, 2004, on October
12, 2004, the New Hampshire Supreme Court approved the hiring of Diane M. Nicolosi,
Esq., to act as Assistant Disciplinary Counsel to conduct yet another investigation.

On April 19, 2006, Ms. Nicolosi presented Disciplinary Counsel with her findings
and conclusions.

On June 9, 2006, Disciplinary Counsel filed a Request for Dismissal with
Warning to the Committee (attached as an exhibit hereto, in the Appendix at Tab 5).

On June 1, 2006, a meeting was held at the Committee's office with Disciplinary
Counsel, Assistant Disciplinary Counsel, Petitioner and Attorney Hantz, at which
Attorney Hantz gave evidence of Mr. Griffith's misconduct.

On June 28, 2006, Petitioner filed a Response to Disciplinary Counsel's Request
for Dismissal (attached as an exhibit hereto, in the Appendix at Tab 4).

On July 19, 2006, the Committee granted Disciplinary Counsel's Request and
dismissed the complaint against Mr. Griffith and issued a warning to Mr. Griffith.

Petitioner has no more appeals available to him at the administrative level and is
therefore filing this Rule 11 Petition.

**Rule 11(2)(g).    Argument.**

Pursuant to the requirements of Rule 11(2)(g), the following is a direct and
concise argument amplifying the reasons relied upon for petitioning this Court to exercise
its original jurisdiction (see section 1 of Rule 11) and setting forth why the relief sought
is not available in any other court or cannot be had through other processes.

10

This Court has been requested to expeditiously exercise its original jurisdiction on the grounds that the Professional Conduct Committee has so far departed from the accepted or usual course of judicial proceedings as to call for an exercise of this Court's power of supervision.

Ignoring evidentiary standards and manifestly violating a citizen's protected constitutional rights to due process and access to the courts should be sufficient to signal to this Court that there has been a major departure from the accepted or usual course of judicial procedures, far beyond the "abuse of discretion" catch-all. To amplify the foregoing, Petitioner respectfully submits that the Professional Conduct Committee deviated from the foregoing, by ordering that Petitioner's complaint against Mr. Griffith be denied despite overwhelming supporting evidence, which met the required burden of proof.

### THE COMMITTEE APPLIED THE WRONG BURDEN OF PROOF TO PETITIONER'S COMPLAINT

The Committee applied the wrong burden of proof. The Committee wrongly applied the "clear and convincing evidence standard" to Petitioner's Complaint. That heightened burden of proof is reserved for the Committee to apply at a hearing.

The correct standard of proof to be applied at the investigatory stage when determining whether or not a hearing is necessary, is the "preponderance of evidence standard."

The investigating attorney must utilize the same standard that a Grand Jury applies when determining whether to bring an indictment. That is to say, the investigating attorney determines if the evidence presented shows whether it is more

11

likely than not that a violation of any Rule of the New Hampshire Rules of Professional Conduct has occurred.

Simply stated, the "preponderance of evidence standard" requires the investigating attorney to assume the role of a cautious and disinterested person who forms his or her belief based upon a "preponderance of the evidence" – evidence persuading the investigator or a disinterested person more likely than not that the alleged facts are true.

The Committee improperly allowed Disciplinary Counsel to exceed her investigatory authority by assuming a role as fact-finder and stating that the clear and convincing standard had not been met.

Plain and simple, the Committee improperly allowed its Disciplinary Counsel to act as judge and jury.

### THE ORIGINAL COMPLAINT SUBMITTED BY PETITIONER IN ITSELF MET THE PREPONDERANCE OF THE EVIDENCE STANDARD AND THE COMMITTEE SHOULD HAVE HELD A HEARING RATHER THAN DISMISSING THE COMPLAINT

The original complaint submitted by Petitioner to the Committee (attached as an exhibit hereto, in the Appendix at Tab 7), in itself met the preponderance of the evidence burden of proof because Petitioner supplied citations to the record for each allegation made. Even without the voluminous additional evidence submitted, and the investigation made by Disciplinary Counsel, with the filing of the complaint, the Committee already had sufficient evidence in hand to necessitate a hearing on the matter.

### THE COMMITTEE ERRED IN NOT ADHERING TO ITS ORIGINAL EVALUATION OF THE COMPLAINT

The Committee erred in not adhering to its original evaluation of the complaint that (i) a hearing was necessary in this matter and (ii) the Committee had a conflict of

12

interest with Mr. Griffith that would warrant Supreme Court appointment of Special

Disciplinary Counsel and a special hearing panel.  See letters from the Committee, dated

December 19, 2003 and January 24, 2004, attached as exhibits hereto, in the Appendix at

Tab 6.

### THE COMMITTEE ERRED WHEN IT FAILED TO GIVE WEIGHT TO EVIDENCE SUBMITTED BY ATTORNEY HANTZ, ATTORNEY PILLSBURY AND GAL ATTORNEY EARNSHAW

During the course of her investigation, Special Disciplinary Counsel met with

Attorneys Hantz and Pillsbury, who represented Petitioner during his divorce and

reported improper acts by Mr. Griffith and corroborated or supplemented the allegations

Petitioner made in his complaint.  Special Counsel misrepresented and failed to include

any of this in her report to Disciplinary Counsel.  GAL Attorney Earnshaw said that

Special Disciplinary Counsel Nicolosi misrepresented what GAL told her.

On June 1, 2006, Disciplinary Counsel met with Petitioner and Attorney Anna

Barbara Hantz.  At that meeting, Attorney Hantz reported that during the trial and post-

divorce proceedings, Mr. Griffith repeatedly engaged in behavior that in her opinion

showed evidence of professional misconduct and pattern of abuse that ought to be tried

before a hearing of the Committee.  Attorney Hantz went out of her way to meet with

Disciplinary Counsel because she felt that Attorney Diane Nicolosi ignored and

misrepresented what she had to say in her interview.

In this meeting, Attorney Hantz made several statements that shed doubt on the

conclusions drawn in the Request for Dismissal.  It does not appear that Disciplinary

Counsel considered Attorney Hantz's contribution in preparing Request for Dismissal,

which seems to rely solely on the work product of Attorney Nicolosi.  In fact, Attorneys

Pillsbury, Earnshaw, and Hantz all disagree with Diane Nicolosi and what she reported.

13

A copy of a letter from Attorney Hantz to Petitioner, prepared for inclusion with

Petitioner's response to Disciplinary Counsel's Request for Dismissal, which was

submitted to Disciplinary Counsel prior to the Committee's decision, is provided as an

exhibit hereto, in the Appendix at Tab 3.

### THE COMMITTEE'S CONCLUSION OF NO EVIDENCE OF PROFESSIONAL MISCONDUCT IS UNSUPPORTABLE ON ITS FACE BECAUSE DISCIPLINARY COUNSEL FOUND MR. GRIFFITH'S CONDUCT, *INTER ALIA*, HARMFUL TO THE CHILDREN AND LACKING BASIC DECENCY

The Committee should have held a hearing rather than dismissing the complaint,

because even in her Request for Dismissal, Disciplinary Counsel conceded that on at least

one occasion Mr. Griffith's conduct was "harmful to the children." (See Appendix at 4,

at pg. 30). How is this not professional misconduct?

Mr. Griffith interfered with attempts to mediate or come to some sort of resolution

between the parties. The evidence in court, attorney correspondence, and Diane

Nicolosi's interviews with Petitioner's attorneys showed that he tried at every

opportunity to mediate this case but Mr. Griffith sabotaged all efforts. (See Appendix at

Tab 4, at pg. 7). As advocate, Mr. Griffith of course had a duty to represent his client,

but Disciplinary Counsel found that his aggression was in fact detrimental to his client

and the children and the Committee should not have dismissed the complaint against him.

The Committee should have held a hearing on Petitioner's and Attorney Hantz's

assertion that Mr. Griffith suborned perjury. As Attorney Hantz stated to in her meeting

with Disciplinary Counsel, Attorney Griffith and his client filed motions and made

statements in court accusing Petitioner of threatening his daughter with a knife. In this

meeting Attorney Hantz told Disciplinary Counsel how at trial Mr. Griffith led Ms.

Wilson through questions on the knife claim (See Appendix at Tab 4, paragraphs 186 -

192). On cross-examination by Attorney Hantz, Ms. Wilson admitted that there was never any knife, and it became clear that Mr. Griffith knew there was no knife but pursued the claim anyway. After the hearing, Mr. Griffith changed his tune and started using the term knife incident or Tupperware bowl incident, depending on the person's point of view. Contrary to Diane Nicolosi's claims, this was not consistent with Mr. Griffith's pleadings and leading question of his client at hearing. Attorney Nicolosi refused to get the transcript of this hearing.

Mr. Griffith repeatedly submitted unreliable evidence over and over again, even after it had been completely discredited or its reliability shown as in doubt. The use of the never-finished D.A.S. Business Plan is a prime example of this tactic. Mr. Griffith submitted this as hard evidence of the value of the business and of certain assets, including the IPNI stock options. IPNI was not a public company and never went public. It just went out of business.

Not only was the stock option information made available to Attorney Durkin, but other documents that were provided by IPNI were given to him. In April of 1999, IPNI went through a 3 to1 reverse stock split. As the record shows, Attorney Durkin was given a copy of the document from IPNI explaining the transaction. So, Mr. Griffith had three confirming sources that the IPNI stock was not worth anything but filed accusations of fraud anyway.

The record clearly shows that the reliability of the draft business plan as evidence was challenged. In addition, the record clearly shows that Mr. Griffith had in his possession much more reliable evidence, *i.e.*, the actual business records. Yet, the record clearly shows that Mr. Griffith continued to quote from the draft business plan. While it

is true that an attorney may wish to use evidence more favorable to his client's position

that does not mean that an attorney may continue to use discredited evidence before three

different judges. Mr. Griffith maneuvered to force the first two judges to recuse

themselves. He then brought up the same claims and caused Petitioner to have to defend

and relitigate the same point over and over again.

There are two divergent views of the significance of the draft D.A.S. Business

Plan, its reliability as evidence and its use, or misuse, by Mr. Griffith. The Committee

should have determined the truth of this at a hearing. Diane Nicolosi ignored a letter from

Attorney Durkin to CPA Albright that showed that the unused business plan was not new

evidence as Mr. Griffith claimed. (Attached as an exhibit hereto, in the Appendix at Tab

4). Attorney Durkin had the unused business plan in his possession before Mr. Griffith

came on this case, but did not see any relevance in it.

### THE REQUEST FOR DISMISSAL CONTAINS FACTUAL ERRORS OR DELIBERATE MISREPRESENTATIONS OF THE RECORD

The Request for Dismissal is full of factual errors, misreading or, deliberate

misrepresentations of the record, apparently in the cause of finding no professional

misconduct. There are myriad examples. Below is a discussion of only a few of the

more egregious examples.

In Paragraph 7 (Appendix at Tab 4, at pg. 3) Disciplinary Counsel noted that

Petitioner and Mr. Kahan bought out their partner, Mr. Trustman. Counsel omitted the

fact that Mr. Trustman's share of the company was purchased for $20,000, which is an

indication that the value of the company was nowhere near the amount suggested in

pleadings submitted by Mr. Griffith.

16

Disciplinary Counsel's description of the circumstances surrounding Attorney Griffith's and Attorney Spaloss's appearances in this case is woefully inadequate and misleading. Indeed, even Judge Hampsey, when he first denied Attorney Spaloss's appearance, stated that he suspected the motive behind Mr. Spaloss's appearance. It is well known that Attorney Spaloss is close friends with both Mr. Griffith and Judge Hampsey. Judge Hampsey does not preside over cases of Attorney Spaloss. Attorney Luci Pillsbury was interviewed by Special Disciplinary Counsel Nicolosi and told Diane Nicolosi that she found the whole Spaloss and Judge Hampsey issue particularly unethical. Luci Pillsbury told Diane Nicolosi that Mr. Spaloss was brought in for the sole purpose of getting Judge Hampsey to recuse himself and did practically nothing. Attorney Pillsbury's experience with the court, Mr. Griffith, and Mr. Spaloss supports Petitioner, and Disciplinary Counsel ignored it completely. Mr. Spaloss lied to the Committee about the use of hours he devoted to this case, which is confirmed by Attorney Pillsbury. Attorney Pillsbury has been informed of the report and states that nothing of what she discussed with Attorney Nicolosi was included in the report. Attorney Pillsbury told Attorney Nicolosi that she saw the Spaloss appearance as judge-shopping. Attorney Pillsbury feels that Mr. Griffith's charges of fraud against Petitioner are grounds for action by the Committee. (See Appendix at Tab 4, paragraph 11, at p. 4, and paragraph 30 ff, at p. 9).

Disciplinary Counsel's description of the events surrounding Mr. Griffith's motions for extension of time for discovery and for recusal is incorrect and misleading. Mr. Griffith appeared in June 1999. Discovery was already closed in May 1999. Mr. Griffith started making false accusations of fraud in order to have discovery reopened

17

two months later. Even though discovery was closed, Attorney Pillsbury still offered up Petitioner's company accounting system for audit. Luci Pillsbury told Diane Nicolosi that Mr. Griffith lied to the court without concern just to get discovery reopened. He refused to disclose where he was getting his bogus information. The transcript of the July 28, 1999 hearing is filled with Mr. Griffith testifying for his client and lying. (see Appendix at Tab 4, paragraph 14, at pg. 4).

The evidence, by way of company financials, was available to Mr. Griffith to show that his claims of "fraud and diversion of assets" were not true. (see Appendix at Tab 4, paragraph 36, pg. 11). Any accountant or lawyer knows that you have to look at the accounting records of a company and then make a challenge, if any. Mr. Griffith lied to the court about not getting a release to look at company financial records; the release was given months before he filed his appearance. Attorney Durkin, Ms. Wilson's former attorney, and Mr. Griffith just never acted on it.

Mr. Griffith then made criminal allegations of fraud against Petitioner in court in a desperate, and ultimately successful, attempt to have discovery reopened. He refused Attorney Pillsbury's demand that he give proof of his claim of fraud.

Disciplinary Counsel implied that Petitioner attempted to slander Ms. Wilson regarding her alcohol abuse. (see Appendix at Tab 4, paragraph 23, at p. 7). That implication is misleading and discredits Petitioner. Ms. Wilson's alcohol abuse was a key factor in the breakdown of the marriage. Ms. Wilson told the GAL that she abused alcohol; it is in the GAL report. The record is full of descriptions of instances where Ms. Wilson was intoxicated and had the children in her care. The Court's Final Decree

18

imposed a condition on Ms. Wilson that she not drink when she had visitation of the children. Ms. Wilson repeatedly disobeyed that court order.

Again, Disciplinary Counsel either misrepresented or misstated when she suggested that Petitioner had a vindictive motive for filing a motion accusing Ms. Wilson of offering to trade custody of the children for money. (See Appendix at Tab 4, paragraph 24, at pg. 7). GAL Attorney Earnshaw testified that Ms. Wilson said that Petitioner could have the children in exchange for her desired financial settlement. Ms. Wilson even told Attorney Earnshaw that she didn't want visitation during weekdays.

Disciplinary Counsel's assertion that "sufficient factual support existed for Mr. Griffith's statement and argument about the products." (See Appendix at Tab 4, paragraph 38, at pg. 12). Draft business plans are not a substitute for the company financial records. The draft business plan was old and out of date when Mr. Griffith got it. However, the general ledger of the company was up to date, but he did not look at it because it did not support his claim of fraud. The brochures Mr. Griffith produced to Attorney Nicolosi in April of 2006 were for products that were obsolete before Mr. Griffith came on the case. (see Appendix at Tab 4, paragraph 38, at pg. 12). The company financial records proved that. It is like handing someone a brochure for Enron: just because a brochure exists does not mean that the product, or even the company, continues to exist.

A copy of the draft business plan can be printed up anytime and made to look as pretty as you want. Since the date on the draft that Mr. Griffith had in July of 1998 was over a year old, it still could not be relied on.

19

The Committee was mislead by its Disciplinary Counsel, who misrepresented the facts of this case involving the draft business plan. In paragraph 40 of her Request for Dismissal, Disciplinary Counsel referenced a letter Petitioner wrote firing a consultant (Atlantic Management) before finishing a project. Atlantic Management had nothing to do with the draft business plan. Mr. Griffith knew the draft business plan was bogus and that Petitioner and his business partner never approved the business plan or its use. The factual information on the company was available to Mr. Griffith in the company financial records. (See Appendix at Tab 4, paragraphs 39-46, pp. 12 ff).

Petitioner does not know about any inheritance Ms. Wilson received in 1986 and finds it suspect that Mr. Griffith produced a fax affidavit dated 1999, in April 2006. If true, then why wasn't this part of testimony or motions during the divorce case?

Regarding the children's education funds, Disciplinary Counsel misrepresented the facts. (see Appendix at Tab 4, paragraphs 47-49, pp. 15-16). Ms. Wilson told the children and Petitioner that their educational money was in bank accounts for each of them. The joint investment funds were the couple's marital investments. Ms. Wilson even listed these accounts as joint marital accounts in 1997, and again in 1998. When Petitioner found out that Ms. Wilson took the children's education funds he opened new accounts for the children. Ms. Wilson accompanied him to the bank when he opened these accounts. Mr. Ginsberg had pre-paid Ms. Wilson for their anticipated tax refund. When the tax refund check arrived Ms. Wilson had to go to the bank to sign documents releasing the check to the children's accounts. Later, when Mr. Griffith came on the case, he filed a Motion for Contempt, for opening these accounts, claiming that Petitioner was hiding money from Ms. Wilson. Then Mr. Griffith filed a new accounting of the

20

marital investments that contradicted the previous two; accounts that had been previously

identified as joint marital were now characterized as the children's educational accounts.

Whatever Ms. Wilson testified to at the hearing was contradictory to the evidence

she provided before Mr. Griffith came on the case. Despite Disciplinary Counsel's

assertion to the contrary (see Appendix at Tab 4, at p. 16), the inconsistencies are

significant. To further demonstrate the inconsistencies and lying Mr. Griffith used to get

discovery re-opened, the following took place in the hearing of July, 28 1999.

```
Mr. Griffith:   Now, at the latter -- last few years, the
                respondent has been involved in developing a
                business with a partner--actually there are
                two businesses, it's the video conferencing
                business--and they have developed soft ware
                to assist in video conferencing. And the
                petitioner has had gifts from her
                grandparents -- grandfather--about
                $60,000 a year for the last three or four
                years --which has gone into this to help
                build this up so that he can concentrate on
                building up this business. So the issue now
                is --
THE COURT:      She, the petitioner, had gifts of $60,000 a
                year?
Mr. GRIFFITH:   A year for the last three or four years.
THE COURT:      Or the petitioner and the respondent had
                gifts --
Mr. GRIFFITH:   It was 20,000 to respondent, 20,000 to
                petitioner, 10,000 to each child; all of
                which went into this business.
```

Ms. Wilson later testified that she didn't have any proof that any money was invested in

Petitioner's company.

Disciplinary Counsel's version of how Mr. Griffith almost contrived to have

Petitioner arrested following the Christmas Eve 2001 motion of contempt for

nonpayment of alimony is riddled with factual errors. (see Appendix at Tab 4,

paragraphs 67ff, pp. 23ff). This was one of the most contemptible ploys Mr. Griffith

used throughout the whole sorry proceedings. At the time Petitioner was in a dispute

21

with his business partner, and locked out of his company; he was not surprisingly unable to pay alimony. Mr. Griffith filed for contempt asking that Petitioner be arrested if unable to pay. While it is true that from one point of view, Mr. Griffith was advocating for his client, it is also true that Petitioner did not have the money; the only way he was able to deliver was to go hat in hand to his friends. Mr. Griffith missed no opportunity to humiliate Petitioner.

The Committee was mislead by Disciplinary Counsel when she stated that the mittimus was issued on Friday, January 4, 2002. (See Appendix at Tab 4, paragraph 69, at pg. 24). In fact, the mittimus was not issued until sometime Monday afternoon, January 7, 2002, after Petitioner had delivered the back alimony. So, when Disciplinary Counsel stated (p. 25) that "Mr. Griffith's motive to lie to Mr. Gottesman about his plans is not readily apparent," she ignored that the mittimus had not yet been issued.

Petitioner borrowed the money from friends and alerted his attorney, David Gottesman, of that fact. This was on Saturday, not Sunday, as the Disciplinary Counsel's report states. Then followed the attempts by Attorney Gottesman to deliver the funds, and the stalling tactics by Mr. Griffith. The reason Mr. Griffith stalled was because the mittimus was not yet issued. Mr. Griffith and Ms. Wilson wanted Petitioner arrested so that they could file an emergency ex parte motion for change of custody. That is why Ms. Wilson and her mother were waiting in the courthouse since 9:00 that morning. Disciplinary Counsel characterizes Mr. Griffith's behavior during this period as perfectly reasonable care for the financial well-being of his client. He could have had the funds in hand over the weekend, but delayed as long as possible in the hope that Petitioner would be arrested, which is supported by Attorney Gottesman.

22

As the deposition of John Hamilton shows, when Attorney Griffith told Attorney Gottesman that he was going to be at the movies, Mr. Griffith was actually at Kinko's in Nashua on Sunday evening, where he met with Ms. Wilson and Mr. Hamilton. Section 16 of Petitioner's original complaint (see the Appendix at Tab 7), describes how, John Hamilton, a friend of Ms. Wilson, in his second deposition, spoke of a plot.

The Request for Dismissal also states that Mr. Griffith "promised to inform the court that the arrearage was paid" (see Appendix at Tab 4, paragraph 86, at pg. 29). In fact, Attorney Gottesman was so suspicious that he went to the courthouse himself to file a notification that the arrearage was paid.

It should also be noted that Attorney Gottesman reviewed and edited the portion of Petitioner's complaint to the Committee that related to these events in order to insure its accuracy.

Attorney Gottesman took copious contemporaneous notes to preserve the record, since these events were so extreme. These notes were made available to Attorney Nicolosi during her investigation. It seems that Attorney Gottesman was convinced by at least a standard of clear and convincing evidence, that Mr. Griffith was doing everything possible to prevent Petitioner from timely paying the arrearage. The Committee should have reviewed the evidence and come to the same conclusion.

In the spring of 2003, Petitioner was forced to consider bankruptcy. Attorney Hantz informed Mr. Griffith that Petitioner had retained Attorney Askenizer, and requested a meeting. Petitioner owed no money to credit card companies. His other creditors were his daughter's private school, and the friends who had lent him funds so that he would not be arrested over New Year's 2002. His business property settlement

23

debt to Ms. Wilson made her by far the major creditor. The purpose of the meeting was to arrange for a period of forbearance so that Petitioner could get his finances in order and possibly avoid bankruptcy. The meeting was held, and although no terms were agreed upon, Petitioner did agree to hold off on filing his bankruptcy petition until he received a counter-proposal from Mr. Griffith (See Appendix at Tab 4, paragraph 134, at page. 44). Disciplinary Counsel states that Petitioner "delayed" filing in exchange for Mr. Griffith's promise to provide a counter-proposal. Attorney Hantz and Attorney Askenizer can corroborate that this was the agreement. There was no further communication from Mr. Griffith until June 2, 2003, when he filed a motion for contempt on Ms. Wilson's behalf. Disciplinary Counsel fails to report that Mr. Griffith also attempted to place a lien on Petitioner's house, which was not only his home, but his children's only home. A motion for contempt and an attempt at attachment are not what one usually expects as a counter-proposal in a negotiation. Mr. Griffith did not deal in good faith with Petitioner, or his attorneys, in this matter. Again, the Committee should have reviewed this conduct and judged for itself.

The final example to be discussed is the supposed cash investment by Ms. Wilson in the companies started by Petitioner and Mr. Kahan. That this is the last example presented should by no means be taken by the Committee to mean that there are not many many more examples that could be discussed. The Disciplinary Counsel's Request for Dismissal is full of factual errors and misinterpretations.

Ms. Wilson claimed that she made a cash investment to seed the startup of Empire Multimedia. This claim was hotly disputed in the divorce proceedings, and a quick perusal of the company financials would show that this was a service company and there

24

wasn't seed money. Petitioner and Mr. Kahan continued to work full-time day jobs and worked on the company at night, after the children were asleep. Ms. Wilson did not invest any money in the companies. However, over the years of the divorce case, and even in a filing in the bankruptcy proceeding, Mr. Griffith continued to advance this claim, obliging Petitioner to once again dispute the already discredited claim. Disciplinary Counsel attempts to dismiss Mr. Griffith from any liability in this matter because Ms. Wilson signed supporting affidavits to his pleadings. However, the record shows Mr. Griffith to be an active proponent of this bogus claim. He has to lead his own witness to get her to answer as he desires. (See Appendix at Tab 4, paragraph 164ff at pp. 54ff). Mr. Griffith looked at the company books and Ms. Wilson testified on the witness stand that she had no proof at all that she invested any money at all.

The Committee should have weighed the evidence and judged whether Mr. Griffith violated the rules of professional conduct. This matter should have been heard by the Committee. The Committee should not have allowed Disciplinary Counsel to be judge and jury on this matter. Justice demands that this Court take original jurisdiction of this matter. Mr. Griffith's lies had a direct effect on Judge Hampsey's decision on the divorce decree and lead to Petitioner's bankruptcy.

### MR. GRIFFITH'S CONDUCT AFTER RECEIVING A COPY OF THE DISCIPLINARY COUNSEL REQUEST FOR DISMISSAL WITH WARNING

Mr. Griffith's conduct after Disciplinary Counsel filed her Request for Dismissal demonstrates exactly the kind of misleading, manipulative behavior he has engaged in. Disciplinary Counsel filed a Request for Dismissal with Warning on June 8, 2006. On June 9, 2006, Mr. Griffith filed a response. The copy he served on Petitioner omitted all of the exhibits. Petitioner obtained the missing exhibits from Disciplinary Counsel.

Upon reading the missing exhibits, Petitioner felt obliged to respond to the Committee and point out the Mr. Griffith's filing took things out of context and mislead the Committee. On July 7, 2006, Petitioner sent an additional response to the Committee, pointing out additional misleading aspects of Mr. Griffith's responses. Petitioner explained that what Mr. Griffith attached to his response is more than misleading. Mr. Griffith conflated the roles of Petitioner's business's accountants and its bookkeeping to make it appear that Petitioner obstructed Mr. Griffith's attempt to obtain financial information. Petitioner's company's business was simple, as it did contract programming by the hour, so its outside accountant only prepared its tax returns.

The complete financial information from the inception of the companies—ledgers, all transactions, payroll, everything—was on the computerized accounting system at the business's office, and this electronic accounting was open to Attorney Durkin while discovery was still open and remained available to Mr. Griffith when he came on the case. In fact, one of Mr. Griffith's attachments, a letter from Attorney Pillsbury to Attorney Durkin, dated April 27, 1999 (before discovery was closed), stated: "The ledgers are in [Petitioner's] office. You may arrange for any time you like to come and inspect them." Back in 1999, computers did not come with CD-ROM burners...you could only read CD-ROMs. This is why Petitioner invited the attorneys to bring their accountants to the business's office to audit its electronic books. Neither Attorney Durkin nor Mr. Griffith ever availed themselves of the opportunity to inspect the company's books. It did not serve Mr. Griffith's purpose to have Petitioner's company's books audited... it did not support the outrageous fraud claims he advanced in his ultimately successful attempt to get discovery re-opened.

26

Petitioner eventually had to purchase an expensive tape back-up system to give the electronic books to Mr. Griffith because of all of his charges of fraud, although he would not send his accountant to the business's office to audit its electronic books. The books were audited, Petitioner assumes by Anthony Albright, and there were no inquiries and no Motions to the court of wrong-doing. But, Mr. Griffith never withdrew his accusations of fraud.

The affidavit of CPA Anthony Albright states that "with the exception of payroll information, Seelye & Schultz has been given no information for the companies later than the year 1997." Since, as Petitioner stated above, the only service Seelye & Schultz performed for D.A.S. and Empire Multimedia was preparation of tax returns, this statement is perfectly reasonable. If CPA Albright wanted the ledgers, Seelye & Schultz never had them. These records were open and available at the business's office. Mr. Albright's affidavit makes it falsely appear that the ledgers were being withheld from Petitioner's company's accountants, thus obstructing discovery.

Mr. Griffith certainly knew where the ledgers were and he certainly understood the impression created by Albright's affidavit, and he was aware of both when he submitted Mr. Albright's misleading affidavit to the court in 1999. Mr. Griffith cannot shift his responsibility in this matter to Mr. Albright simply because Mr. Griffith induced Mr. Albright to sign an affidavit. A sworn statement based on incorrect information is not perjury, but the submission of a sworn statement based on information the attorney knows to be incorrect is professional misconduct.

It is interesting to Petitioner that Mr. Griffith would attach this affidavit and other related documents to his Response, because Petitioner believes that this is actually a very

27

good example of how Mr. Griffith, through conflation, misdirection, misstatement, omission and other rhetorical tricks, deceived the court throughout this excruciatingly long litigation.

<div style="text-align:center">

THE COMMITTEE SHOULD HAVE CONSIDERED
THE EVIDENCE THAT MR. GRIFFITH LIED
NOT ONLY IN THE GINSBERG DIVORCE,
BUT IN HIS OWN DIVORCE CASE AND BEFORE THIS COURT

</div>

Mr. Griffith's conduct in other matters, such as lying in his own divorce case, which led to his arrest for non-payment of alimony (see Appendix at Tab 9), Mr. Griffith did not pay his ex-wife alimony for several months and claimed poverty to the court. Mr. Griffith left out that he owned a villa in Italy where he spends more than two months out of the year, keeps ownership of his home in a South African trust, bought a late model BMW with a payment of $500 a month, and there is ownership of rental property in his wife's name. He has dragged his ex-wife through the legal system for the past nine years. Although she was awarded half his salary in their divorce, because of his ploys in court and mounting legal bills, she was induced to accept a bad deal to get a percentage of Mr. Griffith's contingent fee in a case in Massachusetts. In the revised order, Mr. Griffith committed to paying his former wife a percentage of his fees from the "LMA case." The modification also stipulated that Mr. Griffith pay his former wife $500 a month support pending collection in that case. Mr. Griffith's ex-wife is no longer able to pay her lawyer had to represent herself *pro se*. Mr. Griffith has taken advantage of this situation by ignoring court orders to keep his ex-wife up to date with his legal case in Plymouth, Massachusetts. To date Mr. Griffith has not supplied his ex-wife with copies of motions or any documentation, bills or receipts documenting the whereabouts of the more then $300,000 he has collected thus far. Then Mr. Griffith claimed to this Supreme Court that

<div style="text-align:center">28</div>

there was no recovery in the LMA case and that therefore all of his obligations under the modified order had expired. Mr. Griffith lied to the Court when he stated that he would probably be unable to collect his fees, and that there were no further appeals pending in his collection case against Malouf, Inc. Please see court documents attached as an exhibit hereto in Appendix at Tab 8. These documents illustrate that at the time Mr. Griffith appeared before the Supreme Court, he had a judgment in his favor in his fee collection case against his client. The trial court's decision had been appealed to the Massachusetts Supreme Judicial Court, and was fully affirmed. A judgment was issued. Mr. Griffith was granted a security interest in a personal trust benefiting Mr. Malouf, in order that Mr. Griffith be fully secured. While it may (or may not) be true that Mr. Griffith had not collected the fees which he had agreed under the modified support order to share with his former wife, at the time he appeared before this Court, he had a judgment in his favor for fees. He mislead this Court. Evidence of this behavior was submitted to Disciplinary Counsel as support for the allegation that even if each individual act by Mr. Griffith did not, in itself, constitute professional misconduct, that taken as a whole, they illustrate a pattern that aggregates in professional misconduct. This pattern was demonstrated by the Petitioner in the Ginsberg divorce case, and the Petitioner offered the Committee the evidence that Mr. Griffith's actions in the Ginsberg divorce were not some isolated anomaly, but Mr. Griffith's typical modus operendi. Disciplinary Counsel did not provide this evidence to the Committee in her Request for Dismissal. The Committee should have considered this evidence.

29

In conclusion, the Professional Conduct Committee's failure to act and its abuse of its powers has materially damaged Petitioner. The Committee's callous disregard for Petitioner's well-established and fundamental constitutional rights creates a disqualifying appearance of bias. Public confidence in the integrity of the bar will be further damaged if this Court were to tacitly condone the action of a Professional Conduct Committee that totally ignores evidence submitted to it, in favor of protecting an attorney against a clear case of wrongdoing. The Professional Conduct Committee has demonstrated the kind of abuse of process that should not be condoned by the highest court of the State.

**Rule 11(2)(h).     Jurisdiction.**

This Petition is authorized by New Hampshire Supreme Court Rule 11(1), because the Professional Conduct Committee has so far departed from the accepted or usual course of judicial proceedings as to call for an exercise of this Court's power of supervision.

**Rule 11(2)(i).     Issues preserved for review.**

A statement, if applicable, that every issue specifically raised has been presented to the trial court or administrative agency and has been properly preserved for appellate review by a contemporaneous objection or, where appropriate, by a properly filed pleading.

Not applicable.

**Rule 11(2)(j).     Parties of record and their counsel**

Arthur Ginsberg
10 Glendale Dr.
Nashua, NH 03064
*Pro se*

30

John P. Griffith, Esq.
Griffith Law Office
1020 Isaac Frye Highway
PO Box 1208
Wilton, NH 03086

Landya McCafferty, Disciplinary Counsel
Professional Disciplinary Committee
4 Park Street
Concord, NH 03301

## Rule 11(2)(k).    Required Transcript.

A statement as to whether a transcript of any proceedings will be necessary if the

petition is accepted for further review by the Court. If a transcript will be necessary if the

petition is accepted, then the petition shall also contain a Transcript Order Form. (The

Transcript Order Form appears as part of the two Notice of Appeal Forms that may be

found in the appendix to these rules.)

Not applicable.

31

CONCLUSION

The Petitioner respectfully requests that this Honorable Court order that:

A.  The Court take original jurisdiction over Petitioner's complaint against Attorney Griffth, and

B.  Any other appropriate relief that is just and proper be granted.

Respectfully submitted,

Arthur Ginsberg
10 Glendale Dr.
Nashua, NH 03064

Dated: August 18, 2006

Arthur Ginsberg appeared before me and stated that the facts as stated in this filing are true to the best of his knowledge.

Justice of the Peace/Notary Public

32

## CERTIFICATION OF SERVICE

I, Arthur Ginsberg, acting *pro se* in this matter, certify that copies of this Petition for Original Jurisdiction are being sent this day to:

> Landya McCafferty, Disciplinary Counsel
> Professional Disciplinary Committee
> 4 Park Street
> Concord, NH 03301

> and to

> Attorney John P. Griffith
> 1020 Isaac Frye Highway
> P.O. Box 1208
> Wilton, NH 03086

Date: August 18, 2006

<div style="margin-left: 50%;">

_____

Arthur Ginsberg
10 Glendale Dr.
Nashua, NH 03064

</div>

33

# SUPREME COURT OF THE STATE OF NEW HAMPSHIRE

JOHN P. GRIFFITH, Esq.,

advs.

#02-131

ARTHUR GINSBERG

## Rule 11 Petition for Original Jurisdiction

### APPENDIX

### Table of Contents

Committee Decision, dated July 19, 2006 ............................................................................1

Correspondence between Mr. Griffith and the Committee,
and between Petitioner and the Committee,
dated from June 28, 2006 to July 6, 2006,
in response to Disciplinary Counsel's Request for Dismissal with Warning ......................2

Attorney Hantz's letter to Petitioner, dated June 28, 2006 ...................................................3

Petitioner's Response to Disciplinary Counsel's Request for
Dismissal with Warning, dated June 28, 2006......................................................................4

Disciplinary Counsel's Request for Dismissal with Warning, dated June 9, 2006 .............5

Correspondence between Petitioner and the Committee,
dated from January 24, 2003, to March 10, 2004 .................................................................6

Petitioner's Complaint to the Committee, dated December 19, 2002 ..................................7

Docket and Selected Pleadings from Griffith v. Malouf case ............................................8

Record of Griffith Arrest, dated June 28, 2005 ...................................................................9

Selected Pleadings from Griffith v. Griffith case ..............................................................10

Letter from Attorney Durkin to CPA Albright, dated March 31, 1999 .............................11

Rule 37 ................................................................................................................................12

Rule 37A .............................................................................................................................13